UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> EXCELL CLINICAL LAB, INC., MARINA BELOTSERKOVSKY, ALEXIOS APAZIDIS, M.D., ALEXIOS APAZIDIS, M.D. P.C., WILLIAM JONES, M.D., PHOENIX MEDICAL SERVICES, P.C. d/b/a ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION, HERSCHEL KOTKES, M.D., and HERSCHEL KOTKES, M.D., P.C., <br><br> Defendants. | C.A. No. |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.  <u>INTRODUCTION</u>

1.     This is a case about an unlicensed clinical urine drug testing laboratory, its managers/operators, and referring physicians who engaged in a scheme to defraud Allstate by submitting false and fraudulent insurance claims through the U.S. Mail seeking reimbursement under New York's "No-Fault" laws (N.Y. Ins. Law § 5101, et seq.) for urine drug testing and medical services, including surgeries and injections, that were medically unnecessary, and were submitted using fraudulent billing practices and fake diagnoses.

2.     The Defendants each conspired to, and did in fact, defraud Allstate by perpetrating a healthcare billing fraud scheme in violation of state and federal law.

3.     The Defendants took advantage of New York's No-Fault insurance laws by (a) referring patients for an unnecessary panel of urine drug testing ("UDT") in advance of surgical procedures and injections when there was no medical basis for doing so, (b) performing extensive UDT without any rational basis for the selection of particular tests, (c) performing and submitting false and fraudulent charges to Allstate seeking payment for the unnecessary UDT, and (d) performing a multitude of unnecessary surgical procedures and injections without even reviewing the results of the UDT, which was the platform for the scheme alleged herein.

4.     This scheme involved an unlicensed UDT laboratory, Excell Clinical Lab, Inc. ("Excell") that operated by and through its owner, Marina Belotserkovsky ("Belotserkovsky") (collectively, "Excell Defendants"), and that conspired with several medical providers that referred for UDT, including Alexious Apazidis, M.D. ("Apazidis"), William Jones, M.D. ("Jones"), and Herschel Kotkes ("Kotkes") (collectively, "Referring Provider Defendants"), through their respective PCs, Alexios Apazidis, M.D. P.C. ("Apazidis PC"), Phoenix Medical Services, P.C.

2

d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix"), and Herschel Kotkes, M.D., P.C. ("Kotkes PC") (collectively, "PC Defendants").

5.      As detailed below, Excell was never eligible to seek or receive No-Fault payments from Allstate because (a) Excell did not actually provide any services to Allstate Claimants; (b) Excell was not licensed to perform definitive confirmatory testing until August 8, 2019, and even after it became licensed, Excell billed for definitive confirmatory testing services that were actually provided by an independent lab in violation of the No-Fault Regulations; (c) Excell was and remains unlicensed to do business in New York and is therefore is ineligible to bill under New York's No-Fault laws; (d) the UDT performed by Excell was not medically necessary or clinically justified; and (e) the broad, and in many instances, predetermined, array of analytes tested by Excell bore no rational basis to each patient's actual circumstances and was not actually used as part of the patient's care or treatment plan.

6.      Similarly, the Referring Provider Defendants and PC Defendants were never eligible to seek or receive No-Fault payments from Allstate because they (a) administered extensive, medically unnecessary treatment without regard for patients' symptoms, age, gender, diagnosis, or injury severity; (b) performed surgical procedures and injections without exhausting conservative treatment measures; (c) failed to document patient progress or planned outcomes; and (d) performed a pattern of excessive, medically unnecessary care that had no foundation in evidence-based medicine.

7.      Through this action, Allstate seeks to recover money fraudulently obtained by and through the Defendants in connection with the fraudulent UDT and medical services billed by the Excell Defendants and Referring Provider Defendants in connection with patients eligible for No-Fault benefits under Allstate insurance policies ("Allstate Claimants").

8.      Under NYCRR 65-3.11, an insurer, "upon assignment by the applicant…shall pay benefits directly to providers of health care services."

9.      Each of the patients treated by Excell and the Referring Provider Defendants executed Assignment of Benefits forms allowing the PC Defendants to collect benefits directly from Allstate and other insurers for the tests and services rendered.

10.     The patients at issue in the subject complaint presented for medical treatment with one or more of the Referring Provider Defendants.

11.     After consultation with Apazidis, Jones, or Kotkes, the patients were typically recommended for a surgical procedure or injection, which was often performed on the very same day.

12.     While Apazidis, Jones, and Kotkes typically indicated that UDT was necessary for surgical clearance, the results of UDT were not reported until several days *after* the surgical procedures.

13.     During the patient consultations, Apazidis, Jones, and/or Kotkes would collect a urine specimen.

14.     In some cases, Apazidis, Jones, and Kotkes would perform Point of Care/presumptive testing.

15.     Regardless of whether an unexpected result was obtained, Apazidis, Jones, and Kotkes referred specimens to Excell for immunoassay testing and/or an expansive panel of confirmatory testing.

16.     After it received a urine specimen, Excell referred the specimen to Suretox Laboratory, LLC ("Suretox") to perform the actual UDT, yet Excell billed Allstate for the

immunoassay screening and confirmatory UDT that was not necessary and was done in violation of the established standard of care in the clinical laboratory community.

17.     Suretox is a toxicology laboratory located in Elmwood Park, New Jersey.

18.     Even though Suretox actually performed the testing for which Excell billed Allstate, Suretox never billed Allstate for any drug testing or service provided to New York Allstate Claimants.

19.     Excell provided no actual services to Allstate claimants and therefore was not a provider of health services eligible for New York No-Fault Benefits pursuant to NYCRR 65-3.11.

20.     Excell was not licensed in New York to perform confirmatory testing until August 8, 2019.

21.     Even after it was licensed, Excell never actually performed any testing services on behalf of Allstate Claimants.

22.     Despite not performing the billed-for services, Excell sought reimbursement from Allstate for presumptive immunoassay screening and definitive confirmatory urinalysis testing for the Allstate Claimants.

23.     Excell submitted extensive bills to Allstate that used outdated, inappropriate, and/or fraudulent Current Procedural Terminology ("CPT") codes.

24.     Excell billed for UDT services requested by the Referring Provider Defendants whose patients were prescribed medication under the guise of determining whether (a) patients were complying with their medication regime and/or (b) patients were abusing their prescription medication or illicit drugs.

25.     The Defendants' scheme required a steady pool of patients, which the Excell Defendants obtained through relationships with certain healthcare providers, including the Referring Provider Defendants.

26.     The Defendants engaged in a number of improper practices to maximize referrals, including the use of panel preferences and preprinted forms regardless of medical necessity and non-patient-specific testing.

27.     Excell actively sought to generate as many referrals from the Referring Provider Defendants as possible regardless of the reason for the referral and without a determination from the treating provider that each urine drug test performed was necessary for each patient.

28.     The purpose of the Defendants' scheme was to exploit the benefits available under New York's No-Fault Laws by generating as many bills as possible for as much UDT as possible.

29.     Excell also utilized fraudulent billing practices, including excessive billing under the Worker's Compensation Fee schedule and unbundling.

30.     Billing for services that are not medically necessary for each patient's care, recovery, or rehabilitation is prohibited under New York's No-Fault Laws.

31.     Allstate reasonably relied on Excell's bills to contain truthful and accurate representations regarding the UDT allegedly performed and the necessity for the same.

32.     The abusive laboratory practices employed by the Excell Defendants, including non-patient-specific testing and the use of preprinted forms that encourage excessive testing, have been condemned.

33.     The federal government, for example, has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive UDT on the referring provider.

6

34.     All of the Defendants' actions described throughout this Complaint were undertaken knowingly and intentionally.

35.     The insurance fraud scheme executed by the Defendants was designed to, and did in fact, result in payment of No-Fault proceeds from Allstate to each of the Defendants.

36.     The Referring Provider Defendants predominantly treated No-Fault patients at various clinics in New York and routinely subjected these patients to extensive treatment, including multiple, unnecessary injections, and in some instances surgery.

37.     The Referring Provider Defendants used this extensive treatment to provide justification for multi-drug UDT panels, which requested that a remarkably similar array of drugs (or analytes) to be tested for various patients.

38.     Upon receipt of such medically unnecessary, unjustified, and unsupported requests for UDT, Excell promptly referred the testing to be performed by Suretox.

39.     There is no evidence that the UDT was ever reviewed by the Referring Provider Defendants or was used to alter the patients' care in any way, such as changing medications or dosages based on the UDT results.

40.     Consequently, it is clear that the UDT referred to Excell by the Referring Provider Defendants was not medically necessary or justified, and was merely used as a vehicle to take advantage of New York's No-Fault laws and to enrich the Defendants at the expense of Allstate and its insureds.

41.     Throughout the course of this scheme, the Defendants (or those working under their direction and control) purposely induced Allstate to pay Excell for the UDT purportedly performed by Suretox knowing that the charges for such UDT were not compensable under New York law.

42.     The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim reimbursement documents averring the Excell Defendants' and PC Defendants' eligibility to collect No-Fault benefits under New York law.

43.     Allstate reasonably relied on the facial validity of the Defendants' documents—and the representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the Excell Defendants and PC Defendants.

44.     Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of the Excell Defendants and the PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

45.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; and (3) unjust enrichment.

46.     Allstate's claim for compensatory damages include: (1) payments made by Allstate to Excell in reliance upon the Defendants' false representations that Excell was eligible to receive reimbursement under New York's No-Fault Laws; (2) payments made by Allstate to the PC Defendants in reliance upon the false medical documentation submitted, or caused to be submitted, by the Defendants; (3) treble damages; (4) statutory interest; (5) costs, including, but not limited to, the costs of claims handling and the cost of investigation to uncover the fraudulent scheme executed by the Defendants; and (6) attorney's fees.

47.     Allstate seeks to recover actual damages totaling over $1,314,230.43, which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the Defendants during the course of this scheme.

48.     By this Complaint, Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that Excell has no right to receive payments from Allstate for any pending and previously-denied claims for UDT services that were not reasonably necessary and/or were not properly billed.

49.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the PC Defendants have no right to receive payment from Allstate for any pending and previously-denied claims for medically unnecessary services and testing.

## II.     THE PARTIES

### A.     PLAINTIFFS

50.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

51.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in New York.

### B.     DEFENDANTS

#### 1.   EXCELL DEFENDANTS

##### a.   EXCELL LABORATORY, INC.

52.     Excell is a corporation organized under the laws of the State of New Jersey.

53.    Excell maintains its principal place of business at 1 Ethel Road, Building 103, Suite B, Edison, New Jersey.

54.    Excell currently holds a clinical laboratory permit issued by the State of New York to conduct comprehensive toxicology testing.  Prior to August 8, 2019, Excell was only licensed to conduct presumptive testing (and not definitive/qualitative testing).

55.    Regardless of the fact that Excell purportedly holds a clinical laboratory permit, at all relevant times, Excell had no authority to do business in New York.  *See* correspondence from the New York Department of State dated November 16, 2020 attached hereto at **Exhibit 1**.

56.    Excell referred virtually all of the urine samples purportedly collected from the Allstate Claimants at issue in this Complaint to Suretox for UDT.

57.    As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with Excell, which gave Excell the right to seek payments directly from Allstate—payments that were funded using the claimants' available No-Fault insurance coverage.

58.    Following the execution of these assignment of benefit agreements, Excell, in virtually all instances, caused Suretox to perform the requested UDT.

59.    Excell then sought and collected No-Fault benefit payments from Allstate for the UDT testing performed by Suretox.

### b.  MARINA BELOTSERKOVSKY

60.    Belotserkovsky resides in and is a citizen of the State of New Jersey.

61.    Belotserkovsky is a founding member of Excell.

62.    According to documents filed with the State of New Jersey Division of Revenue and Enterprise Services and the State of New Jersey Department of Health, Belotserkovsky, at all relevant times, has been a member of Excell.

63.     At all relevant times, Belotserkovsky directed the operation and management of Excell as the President of Excell.

64.     As detailed below, Belotserkovsky used Excell to exploit New York's No-Fault Laws, and to systematically defraud Allstate through the performance of UDT that was fraudulently billed.

### 2.   REFERRING PROVIDER DEFENDANTS

#### a.   ALEXIOS APAZIDIS, M.D. P.C.

65.     Apazidis PC is a domestic corporation organized under the laws of the State of New York with its principal office located in Suffolk County.

66.     Apazidis PC is owned by Apazidis.

67.     Apazidis referred its patients to Excell for unnecessary UDT through the use of pre-selected panel preference forms.

68.     Apazidis also billed Allstate for medical services and procedures that were not medically necessary.

#### b.   PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION

69.     Phoenix is a domestic corporation organized under the laws of the State of New York with its principal office located in Nassau County.

70.     Phoenix is owned by Jones.

71.     Phoenix referred its patients to Excell for unnecessary UDT through the use of pre-selected panel preference forms.

72.     Phoenix also billed Allstate for medical services and procedures that were not medically necessary.

### c.  HERSCHEL KOTKES, M.D., P.C.

73.      Kotkes PC is a domestic corporation organized under the laws of the State of New York with its principal office located in Nassau County.

74.      Kotkes PC is owned by Kotkes.

75.      Kotkes referred its patients to Excell for unnecessary UDT through the use of pre-selected panel preference forms.

76.      Kotkes also billed Allstate for medical services and procedures that were not medically necessary.

### d.  ALEXIOS APAZIDIS, M.D.

77.      Apazidis resides in and is a citizen of the State of New York.

78.      Apazidis is the owner of Apazidis PC.

79.      Apazidis was licensed to practice medicine in the state of New York at all relevant times.

80.      Apazidis participated in the operation of the Excell and Apazidis PC enterprises by billing Allstate for the fraudulent and non-compensable medical services and unsupported UDT.

81.      Apazidis caused Allstate to be billed for unnecessary and excessive medical services through Apazidis PC.

### e.  WILLIAM JONES, M.D.

82.      Jones resides in and is a citizen of the State of New York.

83.      Jones is the owner of Phoenix.

84.      Jones was licensed to practice medicine in the state of New York at all relevant times.

85.     Jones participated in the operation of the Excell and Phoenix enterprises by billing Allstate for the fraudulent and non-compensable medical services and unsupported UDT.

86.     Jones caused Allstate to be billed for unnecessary and excessive medical services through Phoenix.

### f.  HERSCHEL KOTKES, M.D.

87.     Kotkes resides in and is a citizen of the State of New York.

88.     Kotkes is the owner of Kotkes PC.

89.     Kotkes was licensed to practice medicine in the state of New York at all relevant times.

90.     Kotkes participated in the operation of Excell and Kotkes PC enterprises by billing Allstate for the fraudulent and non-compensable medical services and unsupported UDT.

91.     Kotkes caused Allstate to be billed for unnecessary and excessive medical services through Kotkes PC.

## III.  JURISDICTION AND VENUE

92.     Subject matter jurisdiction of this action is conferred upon this court by 28 U.S.C. § 1331.

93.     Supplemental jurisdiction over the plaintiff's state law claims is proper pursuant to 28 U.S.C. §1367.

94.     Venue is proper pursuant to U.S.C. §1391 (b) (2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

95.     At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault Laws, as detailed, *infra*.

96.     The Defendants' activities and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under the No-Fault Laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

97.     As the allegations and causes of action in the within Complaint arise from the Defendants' fraudulent demands for payment under the No-Fault Laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

98.     The Referring Provider Defendants and PC Defendants also conducted business in the State of New York by (a) billing for medical services that were purportedly provided to patients who lived in New York or who were covered by New York automobile insurance policies issued by Allstate, and (b) referring these New York-based patients for injections and other procedures.

## IV.     APPLICABLE LAWS AND REGULATIONS

### A.     NEW YORK NO-FAULT LAWS

99.     Allstate underwrites motor vehicle insurance in the State of New York.

100.     New York's No-Fault Laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

101.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. INS. LAW § 5101, *et seq.*), and the regulations promulgated thereto (11 N.Y.C.R.R. §65, *et seq.*) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate are required to provide Personal Injury Protection Injury Benefits ("No-Fault Benefits") to claimants.

14

102.    Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

103.    "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. *See* N.Y. INS. LAW §5102(a)(1); 11 N.Y.C.R.R. §65-1-1.

104.    These No-Fault benefits include up to $50,000 per claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

105.    A claimant may assign his or her No-Fault Benefits to third parties, such as healthcare service providers.

106.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider Health Service" or more commonly known as "NF-3").

107.    Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

108.    The NF-3 and CMS-1500 forms are important documents in the insurance industry. These documents certify that the provider's request for payment is not materially false, misleading or fraudulent. *See* 11 N.Y.C.R.R. § 65.3-11 (a); N.Y. INS. LAW §403(d).

109.    Pursuant to N.Y. Is. Law §403 (d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any

15

materially false information, or conceals for the purpose of misleading, information concerning any material fact thereto, commits a fraudulent act, which is a crime."

110.    It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing and other services that: (a) are never provided; (b) were billed by an unlicensed laboratory; (c) billed by an entity that performed no actual services; (d) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; and/or (e) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

### B.    NEW YORK EDUCATION LAWS

111.    Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

112.    New York's No-Fault Laws Expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet *any* applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. §65-3.16(a)(12) (emphasis added).

16

## V.   **EXCELL IS NOT AUTHORIZED TO BILL ALLSTATE**

### A.   **EXCELL DID NOT PROVIDE SERVICES TO ALLSTATE CLAIMANTS**

#### i.   **EXCELL IS NOT PERMITTED TO BILL FOR TESTING SERVICES PROVIDED BY AN INDEPENDENT LABORATORY**

113.   Excell did not provide *any* testing services to any Allstate Claimant in connection with the bills submitted to Allstate.

114.   Indeed, Excell improperly referred each specimen for which it billed Allstate to Suretox for testing.

115.   Excell provided no actual services to Allstate Claimants and therefore was not a provider of health services eligible for New York No-Fault Benefits.

116.   Under 10 NYCRR § 58-1.9, all specimens accepted by a lab or specified test shall be tested on its premises, except for infrequently performed tests or those not included with specialties or subspecialties stated on its permit or those requiring specialized equipment or skill, which may be forwarded to and accepted by another lab approved by the department.

117.   According to New Jersey Law, if a lab refers specimens to another lab, the reference lab must report its findings on the report forms of the reference lab.  *See* N.J.A.C. 8:44-2.7.

118.   However, Suretox does not report its results on its own report forms.  Excell fraudulently billed Allstate for the purported testing provided by Suretox in violation of New York's No-Fault laws.  A true and accurate representation of the test result report is attached hereto as **Exhibit 2**.

119.   Moreover, Excell is not permitted to seek No-Fault payments for testing services performed by Suretox.

120.   Under the Worker's Compensation fee schedule, laboratories may not seek compensation under New York No-Fault Law for testing services provided by another laboratory.

121.     Specifically, the Worker's Compensation Fee Schedule states, "When the services or procedure is performed by other than the attending provider be it hospital, commercial, or other laboratory, only the laboratory rendering the service may bill and such shall be submitted directly to the responsible payer."

122.     Further, "Payment for laboratory services will be made only to the laboratory service provider actually performing the test." N.Y.C.R.R. § 505.7(g)(3).

123.     Excell receives testing samples from providers who requested testing of various drugs/analytes using a requisition form issued by Excell.

124.     Suretox performed every test for which Excell billed Allstate.

125.     Excell then reports the results of the testing on its own form.

126.     Because Excell did not actually perform the testing services for which it billed Allstate, Excell is not eligible to seek compensation from Allstate under New York No-Fault Law.

127.      According to New York Law and Regulations, only Suretox, the lab that actually performed the testing services, may be entitled to No-Fault Payments.

128.     Excell's bills submitted to Allstate for testing performed by Suretox are not compensable where Excell was not the provider of the billed-for service.

ii.     EXCELL WAS NOT LICENSED TO PERFORM DEFINITIVE CONFIRMATORY TESTING

129.     Prior to August 2019, it was unlawful for Excell to perform definitive confirmatory testing in New York.

130.     Laboratories must be properly licensed in the state of New York to perform each type of UDT (i.e., presumptive testing and definitive confirmatory testing).

18

131.   In addition to obtaining a CLIA number to operate, laboratories must receive a permit from the Clinical Laboratory Evaluation program for each type of testing it performs.

132.   Excell only received a permit for definitive confirmatory testing on August 8, 2019. A true and accurate copy of the August 8, 2019 permit is attached hereto as **Exhibit 3**.

133.   However, in its July 1, 2019 laboratory permit and all prior permits, Excell was not permitted to perform definitive confirmatory testing. A true and accurate copy of the July 1, 2019 laboratory permit is attached hereto as **Exhibit 4**.

134.   Despite being licensed to only perform presumptive testing, Excell billed Allstate for definitive confirmatory testing prior to August 8, 2019, in violation of New York law.

135.   None of the definitive confirmatory testing billed by Excell prior to August 8, 2019, is compensable whereas Excell was not properly licensed in violation of New York Law.

**B.    EXCELL HAS NO CERTIFICATE OF AUTHORITY TO DO BUSINESS IN NEW YORK**

136.   At all relevant times, Excell engaged in systematic and regular activity in New York such that they can be considered to be conducting business in the State of New York.

137.   Despite conducting regular business in New York, Excell has never been incorporated in New York, nor has it ever applied for a Certificate of Authority to operate in New York as a foreign corporation.

138.   Excell has also never been registered with the Office of the Professions in New York.

139.    By failing to obtain a certificate of authority to do business in New York, Excell, at all relevant times, operated in violation of New York law.

140.    Because it was operated in violation of New York law, Excell was, at all relevant times, not lawfully eligible to seek or receive No-Fault benefit payments from Allstate.

19

141.    As a foreign corporation, Excell needed to obtain a physical address within New York before it could provide healthcare services to patients and then seek payment for those services under New York's No-Fault Laws.

142.    Out-of-state laboratories are not permitted to conduct business in New York until the facilities are authorized to do so by the New York State Secretary of State through issuance of a Certificate of Authority.

143.    According to NY CLS Work Comp § 13-c (2), "No claim for services in connection with . . . diagnosis or treatment of any claimant shall be valid or enforceable except by a laboratory . . . authorized and licensed under subdivision one of this section."

144.    By obtaining a certificate of authority, a laboratory is considered authorized and licensed for the purpose of Worker's Compensation and therefore may claim New York No-Fault benefits.

145.    Furthermore, in order to receive no-fault payments under New York Law, a facility must be authorized to conduct business in the state of New York.

146.    Only laboratories that are properly licensed to provide the laboratory services for which they are registered may seek reimbursement under New York No-Fault Law.

147.    Moreover, any laboratory that fails to meet any applicable licensing requirement necessary to perform testing services is ineligible to seek or receive No-Fault benefit payments.

148.    According to the New York Department of State, Excell does not have a license to do business in New York. *See* Correspondence from New York Department of State attached hereto as **Exhibit 1**.

149.    Because it was operated in violation of New York law, Excell was never lawfully eligible to seek or receive No-Fault benefit payments from Allstate.

C.    EXCELL BILLED FOR UNNECESSARY UDT

   i.   OVERVIEW OF UDT

150.    Non-emergency testing of urine for drugs-of-abuse is performed to determine compliance with drug rehabilitation programs, to detect drug abuse in asymptomatic patients, or, as relevant to the patients at issue in this Complaint, to determine compliance with pain management treatment.

151.    The standard of care for clinical laboratories is that clinical urine drugs-of-abuse testing first involves the performance of an initial test ("screen") comparing the result to a cutoff value, which defines the result as "positive" or "negative."

152.    Simply stated, drug screening (hereinafter "presumptive testing") tests for a drug's presence in a urine specimen.

153.    If clinically indicated, urine drugs-of-abuse testing can be confirmed by a second test, which uses a different testing method and is more sensitive and more specific than the presumptive test.

154.    Drugs that have been confirmed can also be quantitated to determine the precise numerical amount of a specific drug in the urine specimen (hereinafter "definitive testing").

155.    Clinical laboratories like Excell use UDT methods that are classified as presumptive or definitive.

156.    The American Medical Association ("AMA") defines "qualitative" tests as those "that detect whether a particular analyte, constituent, or condition is present." *CPT Assistant, Fall 1993*.

157.    In 2015, the AMA renamed the qualitative test as "presumptive UDT."

158.    The AMA defines "quantitative" tests as those "that give results expressing the specific numerical amount of an analyte in a specimen." *CPT Assistant, Fall 1993*.

159.    In 2015, the AMA renamed quantitative testing to "definitive confirmatory UDT."

160.    A presumptive drug test indicates whether a particular drug and/or its metabolite(s)[1] is likely to be present in a specimen, but not the specific concentration of the drug.

161.    The result of a presumptive urine drug test is reported as "positive" or "negative" (i.e., presumptively present or presumptively not present).

162.    A presumptive urine drug test is sometimes referred to as a "urine screen" because presumptive testing is used to screen whether a drug is present or not in the patient's system.

163.    The purpose of performing presumptive urine drug screens is to determine quickly and reasonably accurately whether any one of several drugs and/or drug classes is likely to be present in the specimen.

164.    Presumptive UDT (i.e., screening) is performed to separate unexpected results, which may require additional confirmation or possibly definitive confirmatory testing, from expected results, which generally do not require any further testing.

165.    In contrast, definitive confirmatory UDT produces a precise numeric value representing the concentration of a specific drug in the sample using a more complex and expensive testing method than presumptive testing.

166.    By definition, a definitive confirmatory testing analytic methodology must be capable of producing and reporting a precise numeric value representing the concentration of the substance(s) measured in the specimen.

---

[1] A metabolite results when a drug is broken down by the body into a modified form of the drug.  The use of the word "drug" throughout this Complaint includes any metabolite(s) of the drug, unless specifically stated otherwise.

167.    Definitive confirmatory UDT provides definitive proof of the presence and concentration of specific drugs in a urine specimen at the time of collection due to the heightened sensitivity and specificity of its results.

168.    In other words, it indicates in precise and reliable amounts how much of the drug is found in the patient's urine.

169.    In order for a provider, or an insurer such as Allstate, to be able to confirm that definitive confirmatory UDT was in fact performed, the laboratory must identify the testing method used to generate the precise numeric value.

### ii.    BILLING FOR UDT

170.    The defendants submitted/caused to be submitted reimbursement claims to Allstate through the U.S. Mail on Health Insurance Claim Forms ("HICF") (also known as "CMS-1500" claim forms) approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

171.    The defendants submitted/caused to be submitted reimbursement claims to Allstate containing Current Procedural Terminology ("CPT") Codes seeking payment for UDT purportedly performed on specimens received from the Referring Provider Defendants and patients located in New York.

172.    CPT Codes are published annually by the AMA to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

173.    According to the Health Insurance Portability and Accountability Act ("HIPAA"), all healthcare providers are mandated to bill insurance carriers, including automobile insurance carriers like Allstate, utilizing the HIPAA-defined standard transaction code sets (which, in the context of this Complaint, are the CPT Codes).

174.    Each provider has the responsibility to select the CPT and/or HCPCS Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

175.    The CPT Code Book details which UDT billing codes are applicable when submitting a reimbursement claim seeking payment for a presumptive urine drug screen.

176.    The CPT Code Book also details the correct CPT Codes for the more specific and complex definitive confirmatory urine drug tests.

177.    CPT Codes for definitive confirmatory testing are usually specific to the analyte (drug) being measured in a specimen.

178.    For example, definitive confirmatory UDT for amphetamines is reported using CPT Code 80324 ("*Amphetamine or methamphetamine (For presumptive analysis, see 80100-80103)*").

179.    Thus, definitive confirmatory testing is almost always more expensive than presumptive testing and results in higher reimbursement to the laboratory (Excell) because (1) presumptive codes are ordinarily bundled and only one code is billed regardless of the number of drugs tested, while definitive confirmatory codes are billed for each individual drug tested, and (2) definitive confirmatory tests have a higher reimbursement rate.

180.    If a CPT Code specific to the analyte being tested for is not available, the CPT Code for the testing method used to perform the definitive confirmatory urine drug test is reported instead.

181.    For example, definitive confirmatory UDT where there is no analyte-specific billing code can be reported using CPT Code 82542 ("*Column chromatography/mass spectrometry (eg, GC/MS, or HPLC/MS), analyte not elsewhere specified; quantitative, single stationary and*

24

*mobile phase*") or CPT Code 83789 ("*Mass spectrometry and tandem mass spectrometry (MS, MS/MS), analyte not elsewhere specified; quantitative; each specimen*").

182.    The onus is on the laboratory to select the appropriate billing code based on the drug tested for or the type of urine drug test performed.

D.    **NUMEROUS CONNECTIONS BETWEEN LAB OWNERSHIP AND REFERRING PHYSICIANS**

183.    Excell maintains improper referral relationships with certain providers who refer patients to Excell for UDT.

184.    Kotkes, Jones, and Apazidis refer a disproportionate number of their patients for UDT even though testing is not medically justified based on the patients' treatment and prescribed medications.

185.    Upon information and belief, Excell pays kickbacks to these providers in exchange for their referrals.

186.    As further evidence of the improper referral relationships, portions of the letters of medical necessity submitted by the Referring Provider Defendants share verbatim language, which indicates that Excell provides the language to the referring providers.  A true and accurate copy of the standard form letter of medical necessity submitted to Allstate is attached hereto as **Exhibit 5**.

187.    The form includes a list of potential medical justifications for urinalysis testing, and the referring provider checks one or more boxes to note the reason for the referral.

188.    The most frequently used options are, "I intend to prescribe medication to the patient to help alleviate the patient's pain. Medical guidelines require patient toxicology testing before prescribing opiates. It is important to know if the patient is currently ingesting opiates or other medications that will interfere with the medication prescribed," and "Patient is scheduled to

25

undergo a medical procedure that involves anesthesia. If the patient is currently ingesting opiates or other medication, the Patient may have significant reactions when anesthesia is administered."

189. Indeed, in many cases, the PC Defendants submit identical letters of medical necessity.

190. Because the PC Defendants practice in separate facilities, such use of identical letters of medical necessity indicates that Excell mandates that the Referring Provider Defendants utilize Excell's forms.

191. By providing and using a standard form, Excell and the Referring Provider Defendants failed to appropriately indicate medical necessity based on the patient's treatment and current medications.

192. The PC Defendants and the Referring Provider Defendants justify the necessity of the UDT by submitting template letters of medical necessity.

193. These letters of medical necessity were submitted/caused to be submitted to Allstate through the U.S. Mails.

## VI. MEDICALLY UNNECESSARY UDT

194. The Excell Defendants billed Allstate for a litany of UDT that was medically unnecessary, unreasonable, excessive, and not performed in accordance with established standards of care for UDT.

195. The unnecessary, unreasonable, and excessive UDT performed by the Excell Defendants included (1) unnecessary confirmatory testing of expected point-of-care screening results, (2) failure to perform presumptive testing in the absence of point-of-care screening testing, and (3) unnecessary definitive confirmation testing.

## A.   UNNECESSARY DEFINITIVE CONFIRMATORY TESTING

196.    The standard of care for UDT is that only unexpected screening results should be confirmed, absent extenuating circumstances that must be documented in the patient's medical records by the treating provider.

197.    For example, the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services that sets guidelines for clinical drug testing for federal programs, has stated that "[i]n clinical settings, confirmation is not always necessary.  Clinical correlation is appropriate . . . In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test. However, if the patient disputes the ***unexpected findings***, a confirmatory test should be done." *See* **Exhibit 6** (emphasis added).

198.    Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

### i.   POINT OF CARE TESTING (JONES)

199.    Point-of-care testing ("POCT") is used by providers to obtain immediate drug testing results indicating whether a patient's specimen contains the prescribed medication, an illicit substance, and/or a non-prescribed medication.

200.    In fact, most positive POCT results will be due to the medications prescribed by the provider.

201.    Excell's requisition forms include a section entitled "POCT Screening Results" intended for providers to indicate the POCT results.

27

202.    However, in the majority of requisition forms, the POCT Screen Results section is left blank by the providers, as demonstrated in form attached hereto as **Exhibit 7**.

203.    Additionally, there is no evidence that POCT screening was used as a screening test based on the nonuse of the POCT boxes on nearly all requisition forms.

204.    The only Referring Provider Defendant who regularly employs POCT screening is Jones/Phoenix.

205.    However, regardless of the results of this POCT screening, Jones proceeded to refer patients for definitive confirmatory testing, which was medically unnecessary.

**ii.    IMMUNOASSAY SCREENING (APAZIDIS AND KOTKES)**

206.    Instead of performing generally accepted POCT, Apazidis and Kotkes referred their patients to Excell for immunoassay screening and simultaneous definitive confirmatory testing.

207.    Immunoassay screening is a presumptive test typically performed by an outside laboratory that uses antibodies present in the urine specimen to determine whether certain drugs/analytes are present in the sample.

208.    In fact, most positive immunoassay screening results will be due to the medications prescribed by the referring provider.

209.    Excell's requisition form includes the option to screen for certain substances.

210.    However, in most of the requisition forms submitted by Kotkes and Apazidis to Excell, immunoassay screening was requested simultaneously to definitive confirmatory testing,

211.    There is no indication that the immunoassay screening results were reviewed prior to definitive confirmatory testing.

212.    Indeed, immunoassay screening was not used to screen for substances prior to definitive testing and was therefore useless testing.

28

### iii. DEFINITIVE CONFIRMATORY TESTING

213.    In clinical UDT, confirmatory testing is not always done and should not be done automatically.

214.    Instead, confirmatory testing is to be ordered at the treating provider's discretion and must be patient-specific, e.g., when an initial screening test result is clinically unexpected for the particular patient at issue (such as when a doctor-prescribed drug is reported as negative or when a non-prescribed or illicit drug is reported as positive).

215.    Despite the standard of care for clinical laboratories like Excell that expected screening results do not need to be confirmed, the Excell Defendants nonetheless billed Allstate for useless confirmatory testing of expected results.

216.    Contrary to the standard form statements of medical necessity submitted by Kotkes, Jones, and Apazidis listed in **Exhibit 5**, such universal confirmatory testing is unnecessary and excessive.

217.    Importantly, the PC Defendants did not evaluate the presumptive screening (POCT or immunoassay screening) before making a determination as to whether a definitive confirmatory test was needed.

218.    Absent extenuating circumstances, which must be documented by the treating provider, confirmatory testing by any methodology is not necessary where the screening test indicates that a drug is not present in the patient's urine (i.e., the test is negative).

219.    In rare instances dependent on the individual patient's clinical situation, confirmatory drug testing may be medically necessary when the results of the screening test are presumptively positive or when the results of the screening test are negative and the negative finding is inconsistent with the patient's medical history.

220.    However, for confirmatory testing on a negative presumptive test to be appropriate, the referring provider, and not the testing laboratory, must determine if confirmatory testing is necessary after taking into consideration all known facts at the time the sample is collected.

221.    No provider can make a blanket determination across all patients and all dates of service as to what constitutes reasonable confirmatory UDT in all cases.

222.    Instead, the individual provider must determine the reasonableness and necessity of UDT on a patient-by-patient and visit-by-visit basis.

223.    Excell used excessive and unjustifiable definitive confirmatory testing to confirm the absence of a drug that was clearly reported as "negative," or not present, in the POCT screen performed by the treating provider.

224.    For example, the level of confirmation Excell performed on the specimens of patients undergoing pain management treatment after involvement in predominately low-level motor vehicle accidents significantly exceeded the level of confirmation required by the Nuclear Regulatory Commission's policy on drug testing confirmation.

225.    Persons authorized to operate a nuclear power reactor under the scope of the Nuclear Regulatory Commission ("NRC") are required to submit to drug and alcohol testing as part of their continued duties. 10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

226.    The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested." 10 C.F.R. § 26.31(d)(3).

227.    The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing." 10 C.F.R. § 26.5.

228.    Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

229.    In comparison, Excell billed Allstate for unnecessary confirmatory testing of negative screening results for almost every claim at issue herein, all of which involve patients purportedly injured in low-level motor vehicle accidents and none of whom are known to maintain and/or operate nuclear power reactors.

230.    Excell engaged in a fraudulent scheme designed to obtain payment for excessive and unnecessary confirmatory testing of expected screening test results.

231.    This scheme is objectively fraudulent as it disregards established standards of care for when confirmatory testing is necessary.

232.    The Defendants cannot dismiss their complicity in performing excessive and unnecessary UDT where they repeatedly engaged in medically unjustified and excessive testing.

233.    Confirmatory testing was used primarily to generate bills, as it was employed frequently regardless of whether it was medically indicated by presumptive screening.

234.    Indeed, there is no indication that presumptive testing was ever used as a screening tool.

235.    Furthermore, the presumptive immunoassay testing was unnecessary because Excell performed definitive testing regardless of the results of the screening.

**B.**     **NO RATIONAL BASIS FOR SELECTION OF ANALYTES TESTED**

236.    The Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has formulated a compliance program providing clear guidance to clinical laboratories to reduce fraud and abuse within their organizations and "assist clinical laboratories in developing effective internal controls that promote adherence to applicable Federal and State

law, and the program requirements of Federal, State, and private health plans." *See* **Exhibit 8** at 45077.

237.    With respect to custom profiles and testing panels, the OIG has stated that "standing orders . . . too often . . . have led to abusive practices." *Id.* at 45081; *see also* **Exhibit 9**.

238.    Specifically, the OIG has stated that "[l]aboratories routinely offer customized profiles and panels to physicians. Physicians often order the profile/panel containing the test they need rather than specifying just the needed test(s). Profiles and panels desensitize physician concerns about the medical necessity of the laboratory tests they are ordering. Moreover, panels and profiles contribute to unbundling billing schemes and contribute to the ordering of medically unnecessary laboratory tests." *See* **Exhibit 9** at 13.

239.    With respect to requisition forms, the OIG has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill." *See* **Exhibit 8** at 45079.

240.    Given the relatively high cost of definitive testing, rational selection of analytes is recommended.

241.    Appropriate substances to analyze using UDT include all controlled substances (and selected non-controlled coanalgesics, such as antidepressants and anticonvulsants) that a patient is prescribed, as well as substances unexpectedly positive on previous UDT.

242.    However, overly broad, all-encompassing analyte testing is not recommended.

243.    The purpose of presumptive testing is to screen for unexpected results in anticipation of prescribing medication, ensuring medication compliance, performing a procedure, or other medically justified treatment.

32

244.    In doing so, the standard of care requires providers referring samples for confirmatory testing to select analytes based on the patients' condition, medications, and risk level for noncompliance with medications.

245.    Here, however, there is no discernable rationale for the selection of drugs to be tested, as the Referring Provider Defendants routinely selected a large number of analytes to test regardless of the patient's medical history.

246.    In many cases, providers requested an extensive, multi-drug panel encompassing over 60 separate analytes, even though in most instances the patients were not prescribed any of the tested medications and there was no evidence that they had ever been prescribed those agents.

247.    In fact, nearly all of the patients who underwent testing were not on opioids but were routinely subjected to UDT regardless.

248.    For example, Dr. Jones had his own panel called "U979 – Excell (Dr. Jones)" that he used for many of his patients.

**Panels Ordered**

| Panel Name | Run Information | CPT Codes |
|---|---|---|
| *SureTox (Account #: 971)  Account Bill* | | |
| U979 - EXCELL (DR JONES) U979 | *** Results still pending | |

| DOS | PLACE OF SERVICE | REPORT OF SERVICES RENDERED TREATMENT RENDERED | TREATMENT CODE | MOD | CHARGES |
|---|---|---|---|---|---|
| 11/09/2018 | Suretox Laboratory LLC | AMPHETAMINES | 80325 | 90 | $131.25 |
| | | BARBITURATES | 80345 | 90 | $105.00 |
| | | Benzodiazepines | 80346 | 90 | $157.50 |
| | | THC-CANNABINOIDS | 80349 | 90 | $52.50 |
| | | ILLICITS (1) | 80353 | 90 | $131.25 |
| | | ILLICITS (3) | 80356 | 90 | $52.50 |
| | | OPIOIDS (4) | 80358 | 90 | $52.50 |
| | | ILLICITS (4) | 00359 | 90 | $305.00 |
| | | OPIATES (1) | 80361 | 90 | $157.50 |
| | | OPIATES (2) | 80386 | 90 | $105.00 |
| | | ILLICITS (2) | 83992 | 90 | $45.50 |
| | | | | Total Charges: | $1098.50 |

249.    There was no apparent rational selection of analytes based on the use of custom panels and the extensive list of tested drugs/analytes when the patient was not prescribed any of the tested medications.

250.    Similarly, Kotkes and Apazidis often selected identical analytes for testing regardless of the patient's medications.

251.    Indeed, there are multiple cases in which Jones checked the majority of boxes to request confirmatory testing.

252.    Additionally, there are multiple cases in which Kotkes drew a single line through all boxes to request all available definitive confirmatory tests.





253.    Such practices further demonstrate the lack of patient-specific testing, as the amount of substances selected preclude any likelihood that the tests were selected in response to a specific course of patient care.

254.    Further, the lack of rationale for selection of analytes is evident through the absence of any indication that clinicians reviewed urine toxicology testing or utilized the testing to alter care in any way.

255.    Indeed, there are many cases in which the medical rationale utilized in the records of urine toxicology is wholly unrelated to the patients' treatment or medications.

256.   In certain cases, the Referring Provider Defendants identified medication taken by the patient as justification for testing even though this medication did not appear in the medication list or was not included as part of the ordered tests.

257.   Ultimately, Excell engaged in a fraudulent scheme utilizing improper selections of analytes and justifications for testing designed to obtain payment for excessive and unnecessary confirmatory testing of expected screening test results.

258.   This scheme is objectively fraudulent, as it disregards established standards of care for when definitive confirmatory testing is necessary and which tests are needed based on the patient's specific course of treatment.

259.   The Defendants cannot dismiss their complicity in performing excessive and unnecessary UDT whereas (a) Kotkes, Jones, and Apazidis clearly worked in concert to render unnecessary treatment and generate referrals, (b) each provider relied on a standard form statement of medical necessity providing no more than an unsupported blanket justification for testing, (c) the Referring Provider Defendants ordered presumptive immunoassay screening and simultaneous definitive confirmatory testing, and (d) as discussed below, clinical laboratories are personally held responsible for unnecessary UDT.

### C.   TESTING HAD NO IMPACT ON PATIENT CARE

260.   In order to provide clinicians with evidence-based guidelines for the use of UDT in pain management, the American Academy of Pain Medicine issued consensus guidelines for the use of UDT in 2018, which recommend focused use of UDT as part of ongoing comprehensive risk monitoring in patients prescribed opioids for chronic pain.

261.   However, the guidelines provide several limiting factors based on medical necessity to ensure evidence-based appropriate use of UDT.

262.    In the vast majority of instances, POCT is recommended as a first-line screening tool while definitive confirmatory testing is generally reserved for resolving unexpected results from POCT screening tests.

263.    The definitive confirmatory tests are used to detect specific opioids that cannot be identified with standard immunoassays; however, definitive confirmatory testing is not recommended for routine use in pain management treatment.

### i.    PRETREATMENT TEST RESULTS POSTDATE TREATMENT

264.    The absence of impact that the UDT results had on patient care is evidenced by the numerous examples in which the associated treatment used to justify UDT was performed on the same day as the UDT and/or prior to receipt of definitive confirmatory test results.

265.    In many cases, the Referring Provider Defendants noted that testing was needed for assessment *prior to* pain management treatments, including arthroscopic surgeries, trigger point injections, nerve block injections, steroid epidural injections, and facet injections.

266.    However, in several of these cases, the Referring Provider Defendants performed the arthroscopic surgery and/or injections *prior to* receiving the test results from Excell.

267.    Indeed, in some cases, the Referring Provider Defendants performed the surgery and/or injections on the *same day* they submitted the patient's urine specimen to Excell.

268.    Therefore, it is impossible for the results of the UDT to have had any impact on patient care because the Referring Provider Defendants did not wait for the results of the UDT prior to performance of the associated treatment.

269.    Nevertheless, the standard form letters of medical necessity included in the patients' medical records stated, "Patient is scheduled to undergo a medical procedure that

involves anesthesia. If the patient is currently ingesting opiates or other medication, the patient may have significant reactions when anesthesia is administered." *See* **Exhibit 5**.

270.    However, the Referring Provider Defendants ignored their own medical advice and proceeded to perform the procedure without waiting for the test results showing which medications were currently in their patients' systems.

271.    The below chart highlights examples in which the Referring Provider Defendants issued unnecessary referrals for pretreatment testing in anticipation of treatment which took place prior to receipt of test results.

| CLAIMANT | CLAIM NO. | DATE OF TESTING | DATE OF TREATMENT | DATE OF TEST RESULTS |
|---|---|---|---|---|
| M.B. | 0469022818 | 10/25/2017 | 10/25/17 | 10/30/2017 |
| F.C. | 0472657971 | 1/12/2018 | 1/12/18 | 1/17/2018 |
| L.C. | 0510237472 | 9/17/2017 | 9/17/17 | 10/03/2018 |
| L.R | 0466340056 | 11/2/2017 | 11/2/17 | 11/06/2017 |
| J. G. | 0469022818 | 10/4/2017 | 10/4/17 | 10/09/2017 |
| M. T. | 0468635289 | 10/4/2017 | 10/4/17 | 10/09/2017 |

### ii.    PATIENTS NOT PRESCRIBED OPIOIDS

272.    The majority of Excell claimants were never prescribed opioids despite undergoing frequent extensive UDT, which further demonstrates the lack of medical necessity of the UDT.

273.    The most common reason to monitor patients through compliance testing is in response to patients being prescribed opioids over an extended period of time.

274.    The American Academy of Pain Medicine guidelines recommend that clinicians perform a urine drug screen at baseline in those patients prescribed opioids and recommends a

risk-based monitoring program that provides for more frequent testing based on the patient's risk profile.

275.    The guidelines recommend annual testing for those patients that are low-risk, two or more times per year for moderate-risk patients, and three or more times per year for high-risk patients.

276.    Notably, routine testing of patients not prescribed controlled substances is not recommended.

277.    The Referring Provider Defendants repeatedly justified the use of UDT, including frequent, repeated testing, as part of the patient's plan for care for long term drug therapy.

278.    However, many of the patients referred for testing were never prescribed or reported taking opioids.

279.    Virtually none of the patients presented with any family history of drug use, overuse, or any other factors which would have elevated their risk level relative to opioid abuse.

280.    Furthermore, the Referring Provider Defendants had no reason to continue to repeatedly test patients to monitor compliance with medications when the patients were not prescribed medications that required such monitoring.

281.    The Referring Provider Defendants also failed to document any review or assessment of the test results in the patients' files to explain the rationale for extensive repeated UDT.

### iii.    RAPID ESCALATION OF TREATMENT

282.    Numerous truncated treatment periods further demonstrate the complete lack of medical necessity of the pain treatment plans, as well as the failure of the Referring Provider Defendants to administer patient-specific care.

283.    The Referring Provider Defendants implemented multiple, highly aggressive treatments using a rapid timeline without allowing appropriate time or assessment to determine whether conservative care was effective.

284.    The use of a rapid timeline of care precluded measurement of efficacy of patients' responses to other methods of care, and patient-specific treatment based on analysis of prior treatments.

285.    The patient records largely indicate a general disregard for conservative care and rapid escalation in the level of invasiveness of treatment.

286.    The Referring Provider Defendants' treatment practices focused heavily on injection-based therapies, which were typically utilized early and unnecessarily.

287.    The injections were frequently performed without any medical justification and were repeated numerous times without any documented objective benefit or functional improvement.

288.    Indeed, many of the records lack discussion of patient response to the procedures and integration of diagnostic and imaging studies, which were conducted extensively in addition to the injection-based treatments.

289.    The Referring Provider Defendants utilized several types of injections, including trigger point injections (for myofascial pain), epidural steroid injections (for radicular pain from herniated discs), facet injections and radiofrequency ablations (for spinal facet arthritis), and percutaneous disc decompression (for herniated discs).

290.    The Referring Provider Defendants routinely performed multiple types of injections on each patient irrespective of the patient's presenting complaints or diagnoses.

40

291.    Indeed, many patients underwent multiple trigger point injections, epidural injections, facet injections, and facet radiofrequency ablation treatments over a relatively short amount of time.

292.    Insufficient time elapsed between injection procedures to ascertain whether any benefit was achieved from the preceding injection.

293.    Additionally, the injections were performed in an overlapping fashion over the course of an abbreviated timeline, which precluded the Referring Provider Defendants from objectively evaluating the patient's response to each treatment.

294.    Moreover, despite these multiple repeated injections, there is not a single objective instance of a documented response to treatment, treatment outcome, or alteration of care based on the previously administered treatment.

### iv.    SYMPTOM AND SEVERITY MAGNIFICATION

295.    The majority of patient medical records indicate a high level of symptom magnification between the initial emergency room records and subsequent clinic notes from the Referring Provider Defendants.

296.    Particularly, the Referring Provider Defendants magnified fairly localized sprain/strain injuries into multi-faceted, broad, and diffuse injuries once the patient entered the pain management practices.

297.    For example, claimant A.L. (Claim No. 0509328662) was evaluated in the emergency department on July 11, 2018, and was diagnosed with neck, right shoulder and right knee pain.

298.    Claimant A.L. was subsequently diagnosed with cervical and lumbar sprain and strain, cervical and lumbar radiculitis, traumatic cervical and lumbar paraspinal myofascial

tightness with discogenic radiculopathy and extension of sciatic neuropathy, right shoulder contusion, right shoulder derangement, right knee contusion and right knee sprain and strain upon evaluation on July 19, 2018.

299.    This extensive diagnosis list was then utilized to justify multiple excessive diagnostic imaging studies, including MRIs, ultrasounds, and electrodiagnostic studies.

300.    Similarly, these extensive diagnoses were used to justify subsequent treatments including acupuncture, chiropractic care, physical therapy, medication, and various injection-based treatments.

301.    Certain subsequent treatments, such as medications and injection-based treatment, were used to justify extensive definitive confirmatory UDT.

302.    The Referring Provider Defendants stated in many of the medical records that extensive definitive confirmatory UDT was necessary for patient evaluation on a pretreatment and/or ongoing basis to monitor the patients' drug use as it pertained to their courses of treatment.

303.    However, in the vast majority of treatment records, there is no indication that the Referring Provider Defendants evaluated the patients' continued treatment or extensive definitive confirmatory test results or modified care based on continued treatments and UDT.

304.    Instead, the continued treatment and extensive UDT was used to maximize bills sent to Allstate by the Referring Provider Defendants and Excell.

## VII.    IMPROPER, INAPPROPRIATE, AND FRAUDULENT LABORATORY CONDUCT

305.    Through failed performance tests, lab survey deficiencies, and lack of thorough error investigation with retrospective patient analysis, it is clear that Excell's focus is on producing bills rather than quality patient care.

306.   As explained below, Excell's incomplete and conclusory investigation summaries demonstrate an overall lack of concern for error and low regard for the reliability and accuracy of testing.

307.   Further, Excell's insufficient and often omitted error investigations indicate that the laboratory's goal was to resume testing as quickly as possible to ensure optimal billing.

### A.   OVERVIEW OF PROFICIENCY TESTING AND LABORATORY SURVEYS

308.   Proficiency testing is a method by which the New York Department of Health confirms that laboratories are performing appropriately and are producing satisfactory, accurate test results.

309.   Laboratories holding or applying for a New York clinical laboratory permit must successfully participate in proficiency testing with a CMS-approved provider for all tests/analytes where proficiency testing is mandated under New York law. *See* 42 C.F.R. §§ 493.901-493.959.

310.   Even for tests/analytes where proficiency testing is not statutorily mandated, laboratories must implement systems to confirm the reliability and accuracy of their test results through either external or internal proficiency testing.

311.   Should a laboratory perform unsatisfactorily for the entire permit category or for a particular test/analyte, the laboratory must investigate the cause of unsatisfactory performance and document a plan of corrective action for review by the Clinical Laboratory Evaluation Program (CLEP) within the Department of Health.

312.   The minimum satisfactory score for all analytes is 80%, except for ABO grouping, Rh grouping, and compatibility testing (i.e., blood testing), which requires a score of 100% to achieve a satisfactory result.

313.    However, laboratories must investigate all scores under 100%, regardless of whether the score constitutes a failed performance under proficiency testing guidelines.

314.    Upon a failed performance, the laboratory will receive a two-week notification from CLEP requiring the laboratory to investigate and document the problem that contributed to the unsuccessful performance, implement corrective action, conduct a retrospective review of patient results to ascertain whether similar errors existed in prior testing reports, and notify referring providers of any potential errors in patient test results.

315.    If corrective action is not implemented and documented to the satisfaction of CLEP, the laboratory will be required to cease testing of specimens.

316.    Laboratories seeking a permit must have an initial on-site survey before a permit is issued and before patient testing can be performed.

317.    Routine surveys are generally conducted once every two (2) years unless the report indicates a need for more frequent surveys.

318.    Upon notice of a deficient condition, laboratories are required to submit a plan of correction to CLEP, which is a three-step process that requires the laboratory to (1) investigate and document the root cause of the deficiencies and implement corrective action, (2) determine whether similar errors impacted prior patients, and (3) submit a response to CLEP within 14 days.

**B.    EXCELL'S REPEATED PERFORMANCE FAILURES AND DEFICIENCIES**

319.    Laboratory inspections of Excell revealed repeated laboratory deficiencies and failed performance tests, demonstrating Excell's mismanagement and lack of reliability.

320.    Over multiple laboratory inspections, Excell demonstrated the following errors:

    a.   Failed performance test due to improper test kit on June 16, 2017;

b. Failure to provide a validation summary as noted in October 9, 2018 survey;

c. Failing score of 60% on a Glucose performance test on June 21, 2018 followed by failure to investigate and correct the error;

d. Failing score on Reticulocyte performance test on October 23, 2018; and

e. Failed proficiency test for qualitative alcohol test on June 3, 2019.

321.    Excell has been aware of numerous lab deficiencies that remain unresolved since October 13, 2009, when an official from the New York Department of Health conducted a survey of Excell and found a total of fourteen (14) deficiencies, one (1) of which was a repeated deficiency from a prior survey. A true and accurate copy of the October 13, 2009 survey is attached hereto as **Exhibit 10**.

322.    Notably, Excell was cited for failing to implement corrective action in response to deficiencies noted from a prior inspection, thus demonstrating a pattern of unreliability which continues through the present date.

323.    In its December 14, 2009 plan for corrective action issued in response to the October 13, 2009 survey, Excell claimed, "we feel that we do monitor performance indicators," despite the survey report noting that monitoring was deficient. *See* report attached hereto as **Exhibit 12**.

324.    Excell's failure to address lab deficiencies to ensure reliable and accurate test results is further demonstrated as early as March 2, 2011, when an official from the New York Department of Health conducted a survey of Excell and found a total of eleven (11) deficiencies, five (5) of which were repeated deficiencies from a prior survey. *See* report attached hereto as **Exhibit 11**.

325.    More recently, on October 9, 2018, an official from the New York Department of Health conducted a survey of Excell and found a total of nine (9) deficiencies, two (2) of which were repeated deficiencies from the most recent survey conducted on October 8, 2014. A true and accurate copy of Excell's response to the October 8, 2014 survey report is attached hereto as **Exhibit 13**.

326.    The deficiencies included:

      **a.** Competency assessment technical staff;

      **b.** Competency assessment non-technical staff;

      **c.** Inaccurate specimen type identification;

      **d.** Failure to conduct periodic review;

      **e.** Omitted policy and procedure for training;

      **f.** Multi-drug procedure lacks all elements of standard;

      **g.** Failure to follow quality management procedure;

      **h.** Hematology performance omission; and

      **i.** Failure to provide validation summary.

327.    Such extensive, repeated deficiencies demonstrate Excell's lack of reliability in test results and mismanagement of staff.

## VIII.   FRAUDULENT BILLING PRACTICES

328.    Providers like Excell have a responsibility to select and submit the CPT code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

329.    Excell, by and through the Excell Defendants, failed to meet its responsibility and instead submitted demands for payment to Allstate for (1) testing it did not perform, (2)

testing it was not licensed to perform, (3) testing for New York automobile accident patients knowing it was not authorized to conduct business in New York, (4) unnecessary repeat definitive confirmatory testing that was not performed, (5) unnecessary definitive confirmatory testing, and (6) testing that was not specifically ordered by the provider.

330.    Excell submitted claims to Allstate through the U.S. Mail for testing billed in direct violation of the CPT Code Book and the AMA.

331.    Excell also submitted claims to Allstate through the U.S. Mail for testing billed using the fraudulent billing practice of unbundling, a practice used to increase the amount charged for each specimen purportedly tested.

### A.    SIMULTANEOUS ORDERING AND BILLING OF PRESUMPTIVE AND DEFINITIVE CONFIRMATORY UDT

332.    Excell violated industry standards and CPT guidelines by repeatedly submitting bills for presumptive and definitive confirmatory testing with the same dates of service in violation of standard billing practices.

333.    Industry standards regarding definitive confirmatory testing indicate testing that involves chromatography and mass spectrometry incurs additional expense and thus should only be done for specific indications.

334.    Immunoassay results need only be subjected to definitive testing when the results conflict with the patients' account of their drug use or when drug specificity is needed in class-specific assays (i.e. amphetamines, benzodiazepines, opiates).

335.    Additionally, in pain practice, it is sometimes, but not always, important to identify the specific drug, not just the class of the drug.

336.    There are several cases in which an immunoassay drug screen was ordered and performed at the same time as definitive confirmatory testing for those same substances.

337.     In these cases, there was no rationale explaining why definitive confirmatory testing for such substances would be ordered prior to reviewing the results of a presumptive drug testing screen for these same substances.

338.     The below chart highlights some examples in which presumptive and definitive confirmatory testing was ordered simultaneously without further justification or explanation for the unusual testing timeline.

| CLAIMANT | CLAIM NO. | DATE OF PRESUMPTIVE TEST | DATE OF DEFINITIVE TEST | INCONSISTENT DEFINITIVE CONFIRMATORY RESULTS |
|---|---|---|---|---|
| C.C. | 0481423374 | 12/1/17 | 12/1/17 | Ethyl Glucuronide (Alcohol) |
| D.R. | 0474544350 | 1/25/2018 | 1/25/2018 | None |
| F.C. | 0472657971 | 12/1/2017 | 12/1/2017 | None |
| K.R. | 049404418 | 7/11/2018 | 7/11/2018 | THC COOH |
| M.B. | 0469022818 | 10/25/2017 | 10/25/2017 | Ethyl Glucuronide and Ethyl Sulfate (alcohol) |
| N.M. | 0492924238 | 7/20/2018 | 7/20/2018 | None |
| S.E. | 0490382454 | 4/3/2018 | 4/3/2018 | None |

339.    Despite some instances of unexpected definitive confirmatory testing results, there are no documented presumptive test results indicating a need for such definitive confirmatory testing.

340.    Without any unexpected presumptive results prior to definitive confirmatory testing, Excell has no possible explanation for definitive confirmatory testing.

341.    Since Excell billed for presumptive testing and definitive confirmatory testing simultaneously, Excell had no rationale for performing the definitive confirmatory testing when such testing occurred.

342.    Therefore, Excell used the simultaneous billing for presumptive and definitive

confirmatory testing to maximize bills submitted to Allstate.

**B.    UNBUNDLING OF BILLS FOR CONFIRMATORY TESTING**

343.    Unbundling is the practice of billing for certain tests and/or drugs/analytes under separate CPT codes rather than under a single appropriate CPT Code.

344.    In some circumstances, laboratories unbundle charges for definitive confirmatory testing for specific drugs/analytes or classes of drug/analytes.

345.    For example, rather than charging the insurer for definitive confirmatory testing of opioids, a clinical lab may unbundle the charges by using separate billing codes for various types of opioids.

346.    However, drug class metabolites are not reported separately unless the metabolites are listed as a separate category in the Definitive Drug Class Listing.

347.    Definitive UDT is typically billed using CPT codes 80320 through 80377.

348.    Excell repeatedly unbundled charges for definitive confirmatory testing of amphetamines.

349.    Indeed, there are numerous examples in which Excell used two codes for definitive confirmatory testing when one code was sufficient.

350.    For example, claimant C.C. (Claim No. 041423374) submitted a urine specimen for immunoassay screening and definitive confirmatory testing on November 29, 2017.

351.    Excell subsequently used codes 80324 and 80325 to bill Allstate for definitive confirmatory testing of amphetamines.

352.    However, CPT Codes 80324 and 80325 cannot be billed together on the same date of service.

353.     C.C.'s corresponding lab result report shows definitive confirmatory results for three types of amphetamines.

354.     Instead, these three tests should have been billed under CPT code 80325.

355.     Therefore, CPT code 80324 is unnecessary and unbundled from 80325.

356.     The chart below demonstrates some of the instances in which Excell unbundled CPT codes for definitive confirmatory testing of amphetamines.

| Claimant | Claim Number | Date of Service | Codes Used | Unbundled Code |
|---|---|---|---|---|
| C.C. | 041423374 | 11/29/17 | 80324 (amphetamines one or two), 80325 (amphetamines three or four) | 80324. Results show three types of amphetamines, therefore only 80325 is permitted |
| M.B. | 0469022818 | 10/25/2017 | 80324 (amphetamines one or two), 80325 (amphetamines three or four) | 80324. Results show three types of amphetamines, therefore only 80325 is permitted |
| J.M. | 0481232320 | 11/29/2017 | 80324 (amphetamines one or two), 80325 (amphetamines three or four) | 80324. Results show three types of amphetamines, therefore only 80325 is permitted |

**C.     BILLING FOR REPEATED TESTING USING MODIFIER -91**

357.     Excell frequently billed Allstate the same amount for the same test multiple times on the same date of service using modifier -91.

358.     Under the Worker's Compensation Fee schedule, repeat diagnostic testing is identified using modifier -91.

359.     However, this modifier may not be used when tests are rerun to confirm initial results due to testing problems with specimens or equipment, or for any other reason when a normal, one-time reportable result is all that is required.

360.     Modifier -91 is to be used to bill for testing to track the levels of a substance in a patient over a certain period of time; however, -91 should not be used to bill for testing twice on the same specimen.

361.     Providers may use -91 multiple times on a single date of service to indicate testing was repeated for the purpose of monitoring the patient's levels for certain substances and to provide the appropriate treatment.

362.     Such circumstances typically occur when a patient is being treated in a clinical setting; not as part of a pain-management evaluation.

363.     For example, a lab may perform repeat tests on a patient whose initial results revealed that the patient was hypoglycemic.

364.     If the patient's glucose levels were subsequently monitored and treated then a repeat test would be warranted if, for example, the patient took a glucose supplement and the lab provider performed the test again 30 minutes later on a new specimen.

365.     However, there is no similar showing of medical necessity of repeated testing on a given day in Excell's submissions for reimbursement.

366.     Excell repeatedly used modifier -91 to bill for repeated testing of the same specimen on a single day of service without offering any explanation as to why the duplicate testing was medically necessary.

367.    Further, specimens tested by Excell were tested as part of prescription and recreational drug monitoring as it pertained to treatment, rather than as a part of the treatment itself.

368.    Therefore, even if the repeated testing were medically necessary, it would have still been falsely billed because modifier -91 is not to be used to bill for repeated testing of the same specimen.

369.    Such unjustified repeated billing demonstrates Excell's goal to maximize profits at the expense of Allstate through the use of fraudulent billing coding.

### D.    NON-SPECIFIC CODES

370.    Excell improperly billed Allstate for nonspecific codes absent proper justification.

371.    There are numerous instances in which Excell billed Allstate $52.50 under code 80323 (alkaloids, not otherwise specified.)

372.    In each instance in which Excell billed Allstate under CPT code 80323, it is unknown to which test it refers; Excell improperly failed to provide further supporting documentation.

373.    Without proper justification for such testing, Excell is not permitted to seek reimbursement from Allstate for CPT code 80323.

374.    Further, the repeated use of this nonspecific code without any documentation demonstrates Excell's goal to maximize billing to defraud Allstate.

### E.    EXCELL BILLED ALLSTATE FOR DEFINITIVE TESTING THAT REFERRING PROVIDER DEFENDANTS DID NOT REQUEST

375.    Excell repeatedly billed Allstate for definitive confirmatory testing, which was not requested on the requisition forms submitted by the Referring Provider Defendants.

376.    For example, Apazidis ordered testing for claimant E.G. (Claim No. 0493994743),

on May 24, 2018.

377.    The requisition form requested immunoassay screening and confirmation for opiates, benzodiazepines, and barbiturates.

378.    The requisition form also requested immunoassay screening for ETG (alcohol) and ETH (alcohol).

379.    However, Excell reported results for the requested substances and additional substances including heroin, buprenorphine, methadone, propoxyphene, tapentadol, and tramadol, which is the same list of additional substances tested in specimens from several of Dr. Apazidis' patients.



Additional sheet #1
Continued for E▮▮▮▮▮ G▮▮▮▮ (DOB: ▮▮▮▮)

| REPORT OF SERVICES RENDERED | | | | | |
|---|---|---|---|---|---|
| DOS | PLACE OF SERVICE | TREATMENT RENDERED | TREATMENT CODE | MOD | CHARGES |
| 05/24/2018 | Suretox Laboratory LLC | DRUG SCREEN 10 DRUG,W/O | 80307 | 90 | $850.00 |
| | | ALCOHOL PANEL | 80321 | 90 | $52.50 |
| | | BARBITURATES | 80345 | 90 | $105.00 |
| | | Benzodiazepines | 80346 | 90 | $157.50 |
| | | OPIOIDS (7) | 80348 | 90 | $131.25 |
| | | OPIOIDS (3) | 80354 | 90 | $105.00 |
| | | ILLICITS (3) | 80356 | 90 | $52.50 |
| | | OPIOIDS (4) | 80358 | 90 | $52.50 |
| | | OPIATES (1) | 80361 | 90 | $157.50 |
| | | OPIOIDS (1) | 80364 | 90 | $157.50 |
| | | OPIATES (2) | 80365 | 90 | $105.00 |
| | | OPIOIDS (5) | 80367 | 90 | $105.00 |
| | | OPIOIDS (2) | 80372 | 90 | $52.50 |
| | | OPIOIDS (6) | 80373 | 90 | $105.00 |
| | | | | TotalCharges: | $2188.75 |

380.    The below chart highlights examples in which Excell performed definitive confirmatory tests without a request from the Referring Provider Defendant.

| Claimant | Claim Number | Date of Service | Unrequested Test Performed |
|---|---|---|---|
| D.R. | 0474544350 | 09/14/2018 | THC, Amphetamines |
| E.G. | 0493994743 | 05/24/2018 | MDMA (Included in illicit panel) |
| E.A. | 048840443 | 07/13/2018 | 6-MAM and cocaine |

| Claimant | Claim Number | Date of Service | Unrequested Test Performed |
|----------|--------------|-----------------|----------------------------|
| K.J. | 0520665399 | 12/20/2018 | 6-MAM and cocaine |
| M.R. | 0507792166 | 2/26/2019 | 6-MAM |
| S.A. | 0482980513 | 10/1/2018 | Opioids |
| S.S. | 0482980513 | 8/14/2018 | PCP, relaxants |
| K.C. | 0495100620 | 10/12/2018 | THC |
| M.P. | 0517910063 | 11/12/2018 | THC |
| J.L. | 0517195128 | 9/19/2018 | Relaxants |
| O.P. | 0513996973 | 11/13/2018 | 6-MAM and cocaine |
| S.G. | 0510134760 | 11/2/2018 | 6-MAM |
| L.G. | 0510362841 | 09/20/2018 | THC |
| D.O. | 0509610811 | 08/23/2018 | THC |

381.    The practice of billing for additional definitive confirmatory testing is inherently fraudulent as Excell billed Allstate for additional testing without any documented basis for the performance of additional tests.

382.    Furthermore, Excell's practice of billing for non-requested tests indicates that Excell's focus was on producing and submitting bills rather than performing the tests providers requested.

## IX.    EXEMPLAR CLAIMS

383.    The following are representative examples of the Defendants' practice of billing Allstate for false and fraudulent testing and treatment.

### a.  **Patient D.R. (Claim No. 0474544350)**[2]

384.    Patient D.R. was allegedly involved in a motor vehicle accident on or about September 11, 2017.

385.    Following the motor vehicle accident, D.R. sought medical attention at Good Samaritan Hospital.

386.    D.R.'s complaints included mild to moderate lower back pain and right knee pain radiating to the right ankle.

387.    X-rays were obtained of D.R.'s right knee, right ankle, right tibia and fibula.  No acute displaced fracture or dislocation was identified.

388.    D.R. then presented to Phoenix on October 19, 2017 for an initial consultation with Jones.

389.    D.R. complained of a) low back pain radiating to the lower extremities; b) neck pain radiating to the right upper extremity; and c) upper back pain.

390.    Jones diagnosed D.R. with a) radiculopathy, lumbosacral region; b) other intervertebral disc displacement, lumbar region; c) radiculopathy, cervical region; d) other cervical disc displacement, unspecified cervical region; e) muscle spasm of back; and f) other bursitis of knee, right knee.

391.    Jones indicated in D.R.'s October 19, 2017 medical record that D.R. was taking ibuprofen.  There was no reference to any other medications and/or substances.

392.    During the October 19, 2017 visit, Jones performed a lumbar paravertebral block under ultrasonic guidance; however, Jones *did not* order any UDT at this time.

---

[2] To protect the confidentiality of its insureds, Allstate hereinafter refers to each by his or her initials and Allstate Claim number.

393.     A true and accurate copy of the Health Insurance Claim Form generated by Phoenix and submitted to Allstate through the U.S. Mail for D.R.'s October 19, 2017 initial consultation and epidural injection is attached hereto at **Exhibit 14**.

394.     D.R. presented to Phoenix again on January 11, 2018 complaining of a) neck pain radiating to the upper extremities; b) upper back pain; and c) low back pain.

395.     Jones' diagnosed D.R. with a) radiculopathy, lumbosacral region; b) other intervertebral disc displacement, lumber region; c) radiculopathy, cervical region; d) other cervical disc displacement, unspecified cervical region; e) muscle spasm of back; and f) other long term (current) drug therapy.

396.     Jones indicated in D.R.'s January 11, 2018 medical record that D.R. was taking ibuprofen. There was no reference to any other medications and/or substances.

397.     Jones' January 11, 2018 treatment plan included a lumbar epidural injection.  It was noted that UDT was needed for *pretreatment assessment*.

398.     Despite the specific reference to the need for a *pretreatment assessment*, Jones disregarded his own medical plan and performed the epidural injection during the January 11, 2018 visit.

399.     None of Jones' subsequent reports discuss the results of the January 11, 2018 UDT.

400.     Similarly, none of Jones' subsequent reports discuss any objective benefit or increased functional mobility as a result of the epidural injection.

401.     The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the testing and treatment had no real impact on D.R.'s care, and was therefore medically unnecessary.

402.   Jones collected a urine specimen from D.R. at the January 11, 2018 visit, and subsequently billed Allstate for presumptive testing.

403.   A true and accurate copy of the Health Insurance Claim Form generated by Phoenix and submitted to Allstate through the U.S. Mail for D.R.'s January 11 POCT is attached hereto at **Exhibit 15**.

404.   Jones then sent D.R.'s urine specimen to Excell for definitive confirmatory testing, even though he had *already* performed an epidural injection on D.R. (i.e., the purported justification for such testing).

405.   The January 11, 2018 pre-printed requisition form attached hereto as **Exhibit 16**, indicates a positive finding for benzodiazepines and THC, and requests both positive and negative confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, methadone, heroin, cocaine, PCP, THC and MDMA.

406.   Upon receipt of D.R.'s specimen from Jones, Excell then referred the testing to Suretox to conduct the definitive confirmatory testing requested by Jones.

407.   According to the report attached hereto as **Exhibit 17**, Suretox used a custom panel identified as "U979 (Dr. Jones)", which includes definitive confirmatory testing for thirty-two (32) medications/drugs.

408.   The January 17, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the "U979 (Dr. Jones)" panel were "not detected" in D.R.'s urine specimen.

409.   The Health Insurance Claim Form for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80346 (Benzodiazepines); 80356 (Illicits 3); 80353 (Illicits, 1); 80359 (Illicits 4); 83992 (Illicits 2); 80361 (Opiates 1); 80365 (Opiates 2);

80358 (Opioids 4); 80325 (Amphetamines); 83049 (THC-Cannabinoids); and 80345 (Barbiturates). A true and accurate copy of the Health Insurance Claim Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for D.R.'s definitive confirmatory drug testing is attached hereto as **Exhibit 18**.

410. Jones, Phoenix and Excell unnecessarily facilitated the performance of definitive confirmatory testing since Jones proceeded with the epidural injection despite the positive POCT results for Benzodiazepines and THC.

411. Excell billed Allstate $1,098.50 for these eleven (11) definitive confirmatory testing CPT codes that were performed due to the absence of unexpected POCT results.

412. D.R. was seen at Phoenix again unnecessarily on February 22, 2018; March 29, 2018; and May 3, 2018. During each visit, UDT was ordered "to determine if a change in the patient's prescription drug therapy is warranted." Despite this representation, Jones never prescribed any medication to D.R.

413. During the February 22, 2018; March 29, 2018; and May 3, 2018 visits, D.R. underwent at least one injection (a thoracic paravertebral block injection on February 22) despite no documented change or improvement in D.R.'s condition within Jones' records.

414. On August 24, 2018, nearly one (1) year after the motor vehicle accident, D.R. presented to Apazidis PC with right elbow pain.

415. Apazidis diagnosed D.R. with spontaneous rupture of extensor tendons in the right forearm and suggested that D.R. would benefit from tenotomy and a PRP injection, but insurance had already discontinued six (6) months prior.

416. Apazidis noted that D.R. was taking ibuprofen. There was no reference to any other medications and/or substances.

417. Apazidis subsequently performed a right elbow PRP injection on D.R. on September 14, 2018.

418. A specimen was collected from D.R. during the September 14, 2018 visit and sent to Excell for UDT *after* Apazidis had already performed the injection.

419. Upon receipt of D.R.'s specimen from Apazidis, Excell then referred the testing to Suretox to conduct the confirmatory testing requested by Apazidis.

420. The September 18, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the panel ordered by Apazidis were "not detected" in D.R.'s urine specimen.

421. Apazidis' report contains no documentation as to the need for the UDT or the results of the UDT.

422. Allstate reasonably relied upon the representations of Excell, Phoenix, Jones, Apazidis PC, and Apazidis contained in the submissions of medical records and bills sent through the U.S. mail to Allstate for services purportedly rendered to D.R.

423. On the dates when Jones and Apazidis referred D.R.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

424. Excell unlawfully billed Allstate for UDT services for D.R. performed by Suretox.

425. Excell was not licensed to perform definitive confirmatory testing for D.R.

426. Excell did not provide any service to D.R.

427. Excell was not licensed to provide any service to New York Allstate Claimants.

428. Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

429.     Allstate reasonably relied upon Excell's, Phoenix's, Jones', Apazidis PC's, and Apazidis' representations contained in the submissions of bills for services purportedly rendered to D.R.

430.     As a result, Excell, Phoenix, and Apazidis PC fraudulently billed Allstate a total of $14,429.28 for treatment and testing purportedly rendered to D.R., including $7,793 by Excell, $3,687.55 by Phoenix, and $2,948.73 by Apazidis PC.

**b.  Patient M.B. (Claim No. 0469022818)**

431.     Patient M.B. was allegedly involved in a motor vehicle accident on or about July 30, 2017.

432.     Patient M.B initially presented to Apazidis PC on October 2, 2017 complaining of a) neck pain; b) low back pain; and c) left shoulder pain.

433.     Apazidis diagnosed M.B. with a) impingement syndrome of the left shoulder, and b) neck pain.

434.     Apazidis indicated in M.B.'s October 2, 2017 medical record that M.B. was taking cyclobenzaprine, lidocaine, and oxycodone-acetaminophen; there was no reference to any other medications and/or substances.

435.     A true and accurate copy of the Verification of treatment by Attending Physician or other provider generated by Apazidis and submitted to Allstate through the U.S. Mail for M.B.'s October 2, 2017 initial consultation and trigger point injection is attached hereto as **Exhibit 19**.

436.     During the initial consolation, Apazidis performed a trigger point injection and recommended left shoulder arthroscopic surgery.

437.     None of Apazidis' subsequent reports discuss any objective benefit or increased functional mobility as a result of the trigger point injection.

438.     The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the testing and treatment had no real impact on patient care, and was therefore medically unnecessary.

439.     M.B. presented to Apazidis on October 25, 2017 for left shoulder arthroscopic surgery.

440.     Apazidis collected a urine specimen and sent it to Excell for immunoassay screening and definitive confirmatory testing at the October 25, 2017 visit.

441.     Apazidis did not make any reference to the rationale for UDT at this visit and did not document the result in any subsequent medical records.

442.     Apazidis performed the left shoulder arthroscopy at the October 25, 2017 encounter, prior to receipt of the UDT results.

443.     None of Apazidis' subsequent reports discuss any objective benefit or increased functional mobility as a result of the arthroscopic surgery.

444.     Again, the absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that this treatment had no impact on patient care, and was therefore medically unnecessary.

445.     Apazidis then sent M.B.'s October 25, 2017 urine specimen to Excell for immunoassay screening and definitive confirmatory testing.

446.     The October 25, 2017 pre-printed requisition form attached hereto as **Exhibit 20** lists no prescribed medications and requests Enzyme Immunoassay screening as well as negative confirmatory testing for opiates, benzodiazepines, methamphetamines, barbiturates, oxycodone, buprenorphine, methadone, carisoprodol, 6-MAM (heroin), cocaine, PCP, and MDMA; Enzyme Immunoassay screening for ETG (alcohol), ETH ( (Alcohol), Spice K2, and THC; and positive

confirmatory testing for morphine, codeine, meperidine, tramadol, fentanyl, tapentadol, pentazocine, meprobamate, propoxyphene, and kratom.

447.   Upon receipt of M.B.'s specimen from Apazidis, Excell referred the testing to Suretox to conduct the immunoassay screening and confirmatory testing requested by Apazidis.

448.   A true and accurate copy of the October 25, 2017 pre-printed requisition form completed by Excell and submitted to Suretox is attached hereto as **Exhibit 21**.

449.   The October 30, 2017 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the requisition form were "negative," or not present, in M.B.'s urine specimen except Ethyl Glucuronide and Ethyl Sulfate, which are metabolites of alcohol. A true and accurate copy of the October 30, 2017 lab report is attached hereto as **Exhibit 22**.

450.   None of the medical records generated by Apazidis include any review or explanation as to why M.B.'s specimen was negative for oxycodone when M.B. was purportedly prescribed oxycodone-acetaminophen.

451.   The Health Insurance Claim Form for the immunoassay screening and definitive confirmatory drug testing services utilized the following Thirty-Four (34) billing codes: 80307, 80346, 80356, 83992, 80353, 80324, 80359, 80361, 80365, 80364, 80358, 80358-91, 80367, 80367-91, 80373, 80373-91, 80354, 80354-91, 80348, 80372, 80372, 80325, 80323, 80323-91, 80368, 80368-91, 80370, 80337, 80349, 80350, 80345, 80345-91, 80320, and 80321.  A true and accurate copy of the Health Insurance Claim Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for M.B.'s immunoassay screening and definitive confirmatory testing is attached hereto as **Exhibit 23**.

452.   Excell fraudulently billed Allstate $3,996.00 for these thirty-four (34) immunoassay screening and definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.

453.   On January 8, 2018, M.B. presented at Phoenix complaining of a) neck pain radiating to the upper extremities; b) upper back pain; and c) low back pain radiating to the lower extremities.

454.   Jones diagnosed M.B. with a) other cervical disc displacement, unspecified cervical region; b) radiculopathy, cervical region; c) other intervertebral disc displacement, lumbar region; d) radiculopathy, lumbosacral region; e) muscle spasm of back; f) other long term (current) drug therapy; and g) muscle spasm.

455.   Jones performed a lumbar paravertebral block injection and a qualitative drug screen at the January 8, 2018 visit.

456.   None of Jones' subsequent reports discuss the results of the January 8, 2018 UDT.

457.   None of Jones' subsequent reports discuss any objective benefit or increased functional mobility as a result of the paravertebral block injection.

458.   Once again, the absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that this treatment had no impact on patient care and therefore was medically unnecessary.

459.   A true and accurate copy of the Health Insurance Claim Form generated by Jones and submitted to Allstate through the U.S. Mail for the January 8, 2018 office visit, injection, and drug screen is attached hereto as **Exhibit 24**.

460.   M.B. next presented to Jones on January 22, 2018 for a thoracic paravertebral block injection.

461.    Again, none of Jones' subsequent reports discuss any objective benefit or increased functional mobility as a result of the thoracic paravertebral block injection.

462.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment, once again, demonstrates that this treatment had no real impact on patient care, and was therefore medically unnecessary.

463.    A true and accurate copy of the Health Insurance Claim Form generated by Jones and submitted to Allstate through the U.S. Mail for the January 22, 2018 office visit and injection is attached hereto as **Exhibit 25**.

464.    M.B. presented to Jones on April 3, 2018 for a lumbar epidural steroid injection.

465.    None of Jones' subsequent reports discuss any objective benefit or increased functional mobility as a result of the lumbar epidural steroid injection.

466.    The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no impact on patient care and therefore was medically unnecessary.

467.    A true and accurate copy the Health Insurance Claim Form generated by EMU Surgical Center for the epidural steroid injection performed by Jones on April 3, 2018 and submitted to Allstate through the U.S. Mail is attached hereto as **Exhibit 26**.

468.    M.B. presented to Jones on April 16, 2018, at which time Jones collected a urine specimen and purportedly performed a urine drug screen; however, the results of the dug screen are not included in any of M.B.'s medical records.

469.    Jones indicated in the April 16, 2018 medical record that M.B. was currently taking no medications.

470.    At this time, Jones noted that UDT was needed for ***pretreatment assessment***.

471.     Despite the specific reference to the need for a ***pretreatment assessment***, Jones disregarded his own medical plan and performed a lumbar paravertebral block injection during the April 16, 2018 visit.

472.     None of Jones's subsequent reports discuss any objective benefit or increased functional mobility as a result of the lumbar paravertebral block injection.

473.     The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that this treatment had no impact on patient care, and was therefore medically unnecessary.

474.     Jones then sent M.B.'s April 16, 2018 urine specimen to Excell for definitive confirmatory testing.

475.     Excell then referred the specimen to Suretox to perform the UDT.

476.     The April 18, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the requisition form were "negative," or not present in M.B.'s urine specimen. A true and accurate copy of the April 18, 2018 lab report is attached hereto as **Exhibit 27**.

477.     The Verification of Treatment Form for the definitive confirmatory drug testing services utilized the following thirteen (13) billing codes: 80325 (Amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 80348 (Opioids 7); 80349 (THC-Cannabinoids); 80353 (Illicits 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates1); 80365 Opiates 2); 80369 (Relaxants; and 83992 (Illicits 2).  A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for M.B.'s definitive confirmatory drug testing is attached hereto as **Exhibit 28**.

478.    Excell fraudulently billed Allstate $1,282.25 for these thirteen (13) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.  A true and accurate copy of the Health Insurance Claim Form generated by Jones and submitted to Allstate through the U.S. Mail for the April 16, 2018 office visit and injection is attached hereto as **Exhibit 29**.

479.    M.B. presented to Jones on May 14, 2018, at which time Jones performed a lumbar discectomy.

480.    A true and accurate copy of the Health Insurance Claim form generated by Jones and submitted to Allstate through the U.S. Mail for the May 14, 2018 Lumbar Discectomy is attached hereto as **Exhibit 30**.

481.    M.B. then presented to Jones on May 25, 2018, at which time Jones collected a urine specimen from M.B. to conduct a drug screen.

482.    Jones indicated in M.B.'s May 25, 2018 medical record that M.B. was taking Vicodin and Flexeril.

483.    Jones indicated in M.B.'s May 25, 2018 medical record that UDT was needed for ***pretreatment assessment***.

484.    Despite the specific reference to the need for a ***pretreatment assessment***, there is no subsequent record of treatment that purportedly justified the May 25, 2018 UDT.

485.    None of M.B.'s medical records discuss the results of the drug screen purportedly performed by Jones on May 25, 2018.

486.    Jones then sent M.B.'s May 25, 2018 urine specimen to Excell for definitive confirmatory testing.

487.     The May 25, 2018 pre-printed requisition form attached hereto as **Exhibit 31**, has no prescribed medications and requests both positive and negative confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, methadone, 6-mam (heroin), cocaine, PCP, THC, and MDMA.

488.     Upon receipt of M.B.'s specimen from Jones, Excell referred the testing to Suretox to conduct the confirmatory resting requested by Jones.

489.     The May 31, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the requisition form were "negative," or not present in M.B.'s urine specimen. A true and accurate copy of the May 31, 2018 lab report is attached hereto as **Exhibit 32**.

490.     The Verification of Treatment Form for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80325 (amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 80349 (THC-Cannabinoids); 80353 (Illicits 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80365 (Opiates 2); and 83992 (Illicits 2).  A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for M.B.'s definitive confirmatory drug testing is attached hereto as **Exhibit 33**.

491.     Excell fraudulently billed Allstate $1,098.50 for these eleven (11) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.

492.     Excell unlawfully billed Allstate for UDT services for M.B. performed by Suretox.

493.     Excell was not licensed to perform definitive confirmatory testing for M.B.

494.    Excell did not provide any service to M.B.

495.    Excell was not licensed to provide any service to New York Allstate Claimants.

496.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

497.    Allstate reasonably relied upon Excell's, Phoenix's, Jones', Apazidis PC's, and Apazidis' representations contained in the submissions of bills for services purportedly rendered to M.B.

498.    As a result, Excell, Apazidis PC, and Phoenix fraudulently billed Allstate a total of $66,830.34 for treatment and testing purportedly rendered to M.B., including $6,376.75 by Excell, $48,836.55 by Apazidis PC, and $11,617.04 by Phoenix.

    **c.**  **Patient L.C. (Claim No. 0510237472)**

499.    Patient L.C. was allegedly involved in a motor vehicle accident on July 20, 2018.

500.    L.C. presented to Phoenix on September 17, 2018, complaining of a) neck pain radiating to the upper extremities; b) upper back pain radiating bilaterally; and c) low back pain radiating to the lower extremities.

501.    Jones diagnosed L.C. with a) radiculopathy, cervical region; b) other cervical disc displacement, unspecified cervical region; c) radiculopathy, lumbosacral region; d) other intervertebral disc displacement, unspecified lumbar region; e) muscle spasm of back; f) myalgia; g) other muscle spasm; and h) other long term (current) drug therapy.

502.    Jones indicated in L.C.'s September 17, 2018 medical record that L.C. was currently taking Flexeril and Naproxen; there was no reference to any other medications and/or substances.

503.    Jones' treatment plan included a cervical epidural block injection.  It was noted that urine testing was needed for ***pretreatment assessment***.

504.    Jones collected a urine specimen from L.C. and subsequently billed Allstate for presumptive testing, yet the results of said test are not detailed in L.C.'s September 17, 2018 medical record.

505.    None of Jones' subsequent reports discuss the results of the September 17, 2018 UDT.

506.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no impact on patient care, and was therefore medically unnecessary.

507.    Jones sent L.C.'s September 17, 2018 urine specimen to Excell for definitive confirmatory testing.

508.    The September 17, 2018 pre-printed requisition form attached hereto as **Exhibit 34**, has no prescribed medications and requests both positive and negative confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, methadone, heroin, cocaine, PCP, THC and MDMA.

509.    Upon receipt of L.C.'s specimen from Jones, Excell referred the testing to Suretox to conduct the definitive confirmatory testing requested by Jones.

510.    According to the report attached hereto as **Exhibit 35**, Suretox used a custom panel identified as "U979 (Dr. Jones)" which includes confirmatory testing for thirty-two (32) medications/drugs.

511.    The October 3, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the "U979 (Dr. Jones)" panel were "negative," or not present in L.C.'s urine specimen.

512.    Excell unnecessarily facilitated the performance of definitive confirmation testing, as there is no evidence of unexpected POCT results that would justify definitive testing to confirm the unexpected result.

513.    Verification of Treatment by Attending Physician  or Other Provider of Health Service Form generated by Excell for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80325 (Amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 83049 (THC-Cannabinoids); 80353 (Illicits, 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80365 (Opiates 2); 83992 (Illicits 2). A true and accurate copy of the Verification of Treatment by Attending Physician or Other Provider of Health Service Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for L.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 36**.

514.    Excell fraudulently billed Allstate $1,098.50 for eleven (11) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected POCT results.

515.    L.C. presented to Phoenix for a follow up visit on November 19, 2018.

516.    Jones' treatment plan included a cervical epidural block injection.  It was noted that urine testing was needed for *pretreatment assessment*.

517.    Jones collected a urine specimen from L.C. and subsequently billed Allstate for presumptive testing, yet the results of said test are not detailed in L.C.'s November 19, 2018

medical record. A true and accurate copy of the requisition form filled out by Jones and sent to Excell is attached hereto as **Exhibit 37**.

518.    Upon receipt of L.C.'s specimen from Jones, Excell referred the testing to Suretox to conduct the definitive confirmatory testing requested by Jones.

519.    According to the report attached hereto as **Exhibit 38**, Suretox used a custom panel identified as "U979 (Dr. Jones)" which includes confirmatory testing for thirty-two (32) medications/drugs.

520.    The November 21, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the "U979 (Dr. Jones)" panel were "negative," or not present in L.C.'s urine specimen.

521.    Excell unnecessarily facilitated the performance of definitive confirmation testing, as there is no evidence of unexpected POCT results that would justify definitive testing to confirm the unexpected result.

522.    The Verification of Treatment by Attending Physician or Other Provider of Health Service Form for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80325 (Amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 83049 (THC-Cannabinoids); 80353 (Illicits, 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80365 (Opiates 2); 83992 (Illicits 2). A true and accurate copy of the Verification of Treatment by Attending Physician or Other Provider of Health Service Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for L.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 39**.

523.     Excell fraudulently billed Allstate $1,098.50 for eleven (11) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected POCT results.

524.     Patient L.C. presented to Phoenix again on April 1, 2019.

525.     During the April 1, 2019 visit, Jones performed a lumbar paravertebral block under ultrasonic guidance.

526.     Jones did not collect a specimen from L.C. during the April 1, 2019 visit, nor did he perform POCT or refer a specimen for definitive confirmatory testing; still, he performed an injection.

527.     Allstate reasonably relied upon the representations of Excell, Phoenix, and Jones contained in the submissions of medical records and bills sent through the U.S. mail to Allstate for services purportedly rendered to L.C.

528.     On the dates when Jones referred L.C.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

529.     Excell unlawfully billed Allstate for UDT services for L.C. performed by Suretox.

530.     Excell was not licensed to perform definitive confirmatory testing for L.C.

531.     Excell did not provide any service to L.C.

532.     Excell was not licensed to provide any service to New York Allstate Claimants.

533.     Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

534.     Allstate reasonably relied upon Excell's, Phoenix's, and Jones' representations contained in the submissions of bills for services purportedly rendered to L.C.

535.    As a result, Excell and Phoenix fraudulently billed Allstate a total of $5,633.83 for treatment and testing purportedly rendered L.C., including $4,394.00 by Excell and $1,239.83 by Phoenix.

### d.   N.M (Claim No. 049292438)

536.    Patient N.M. was allegedly involved in a motor vehicle accident on February 24, 2018.

537.    N.M. presented to Phoenix on May 4, 2018 complaining of a) neck pain radiating to the upper extremities, and b) low back pain radiating to the lower extremities.

538.    Jones diagnosed N.M. with a) radiculopathy, lumbosacral region; b) other intervertebral disc displacement, lumbar region; c) radiculopathy, cervical region; d) other cervical disc displacement, unspecified cervical region; e) muscle spasm of back; f) other muscle spasm; and g) other long term (current) drug therapy.

539.    Jones indicated in N.M.'s May 4, 2018 medical record that N.M. was taking enalapril, atorvastatin, amlodipine, hydrochlorothiazide, and aspirin; there was no reference to any other medications and/or substances.

540.    Jones' treatment plan included plans for a thoracic MRI and UDT to assist with diagnosis, corroborate patient drug use, detect the presence of prescribed medication, and identify unauthorized substances.

541.    None of Jones' subsequent reports discuss the results of the May 4, 2018 UDT.

542.    None of Jones' subsequent reports discuss any objective findings or demonstrate any alterations to treatment based on the findings of the thoracic MRI.

543.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

544.    Jones collected a urine specimen from N.M. on May 4, 2018, the results of which were negative for amphetamines, barbiturate, benzodiazepine, cocaine, ecstasy, marijuana, methadone, methamphetamine, opiates, oxycodone, phencyclidine, propoxyphene, and tricyclic antidepressants.

545.    Notwithstanding the negative presumptive test results, Jones then sent N.M's urine specimen to Excell for definitive confirmatory testing.

546.    The May 4, 2018 pre-printed requisition form attached hereto as **Exhibit 40**, has no prescribed medications and requests both positive and negative confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, methadone, heroin, cocaine, PCP, THC and MDMA.

547.    Upon receipt of N.M.'s specimen, Excell referred the testing to Suretox to conduct the confirmatory testing requested by Jones.

548.    According to the report attached hereto as **Exhibit 41**, Suretox used a custom panel identified as "U979 (Dr. Jones)", which includes confirmatory testing for thirty-one (31) medications/drugs.

549.    The May 8, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the "U979 (Dr. Jones)" panel were "negative," or not present in N.M.'s urine specimen.

550.    The Verification of Treatment Form for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80325 (Amphetamines); 80345

(Barbiturates); 80346 (Benzodiazepines); 83049 (THC-Cannabinoids); 80353 (Illicits, 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80365 (Opiates 2); 83992 (Illicits 2). A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for N.M.'s definitive confirmatory drug testing is attached hereto as **Exhibit 42**.

551.    Excell fraudulently billed Allstate $1,098.50 for these eleven (11) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected POCT results.

552.    Patient N.M. subsequently presented to Phoenix for a follow up visit on July 20, 2018.

553.    There was no change in the medications that N.M. was taking in the July 20, 2018 record, yet another specimen was collected for UDT at this time.

554.    The results of the May 12, 2018 and July 20, 2018 confirmatory UDT were reported on Excell's letterhead, but the testing was actually performed by Suretox.

555.    N.M. presented to Jones again on August 13, 2018 for a thoracic epidural steroid injection.

556.    Despite performing an epidural steroid injection, Jones did not perform any UDT.

557.    Allstate reasonably relied upon Excell's and Jones' representations contained in the submissions of bills for services purportedly rendered to N.M.

558.    On the dates when Jones referred N.M.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

559.    Excell unlawfully billed Allstate for UDT services for N.M. performed by Suretox.

560.    Excell was not licensed to perform definitive confirmatory testing for N.M.

561.    Excell did not provide any service to N.M.

562.    Excell was not licensed to provide any service to New York Allstate Claimants.

563.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

564.    Allstate reasonably relied upon Excell's, Phoenix's, and Jones' representations contained in the submissions of bills for services purportedly rendered to N.M.

565.    As a result, Excell and Phoenix fraudulently billed Allstate a total of $8,662.79 for treatment and testing purportedly rendered to N.M., including $6,079.25 by Excell and $2,583.54 by Phoenix.

### e.   Patient S.C. (Claim No. 0512152844)

566.     Patient S.C. was allegedly involved in a motor vehicle accident on July 31, 2018.

567.    S.C. presented to Phoenix on November 28, 2018 complaining of a) neck pain radiating to the upper extremities; b) upper back pain radiating bilaterally; and c) low back pain radiating to the lower extremities.

568.    Jones diagnosed S.C. with a) radiculopathy, cervical region; b) other cervical disc displacement; c) radiculopathy, lumbosacral region; d) other intervertebral displacement, lumbar region; e) muscle spasm of back; f) myalgia; g) other muscle spasm; and h) other long term (current), drug therapy.

569.    Jones indicated in S.C.'s November 28, 2018 medical record that S.C. was currently taking Keppra, unknown Imitrex, unknown Topiramate, unknown Tramadol, unknown Tylenol, and unknown Ibuprofen; there was no reference to any other medications and/or substances.

570.    Jones' treatment plan included UDT to assist with diagnosis, corroborate patient drug use, detect the presence of prescribed medication, and identify unauthorized substances.

571.    S.C.'s November 28, 2018 medical record also indicates that "the results of this drug screen will be used in part prior to the next scheduled appointment to discuss with the patient the results and to determine if a change in the patient's prescription drug therapy is warranted."

572.    Jones' treatment plan also included a cervical percutaneous discectomy.

573.    Jones collected a urine specimen from S.C. at the November 28, 2018 visit and subsequently billed Allstate for presumptive testing, yet the results of said test are not detailed in S.C.'s November 28, 2018 medical record.

574.    None of Jones' subsequent reports discuss the results of the November 28, 2018 UDT.

575.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care and was therefore medically unnecessary.

576.    Jones sent S.C.'s November 28, 2018 urine specimen to Excell for definitive confirmatory testing.

577.    The November 28, 2018 pre-printed requisition form attached hereto as **Exhibit 43**, has no prescribed medications and requests both positive and negative confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, methadone, heroin, cocaine, PCP, THC and MDMA.

578.    Upon receipt of S.C.'s specimen, Excell referred the testing to Suretox to conduct the confirmatory testing requested by Jones.

579.    According to the report attached hereto as **Exhibit 44**, Suretox used a custom panel identified as "U979 (Dr. Jones)" which includes confirmatory testing for thirty-two (32) medications/drugs.

580.    The November 30, 2018 lab report, printed on Excell's letterhead, confirmed that all but one of the drugs/analytes included in the "U979 (Dr. Jones)" panel were "negative," or not present in S.C.'s urine specimen.

581.    The November 30, 2018 lab report listed the positive codeine result as an unexpected positive, despite the notation in Jones' November 28, 2018 report that S.C. was prescribed Tramadol.

582.    Subsequent medical records provided no explanation for this apparent discrepancy.

583.    Excell unlawfully billed Allstate for UDT services for S.C. performed by Suretox.

584.    Excell was not licensed to perform definitive confirmatory testing for S.C.

585.    Excell unnecessarily facilitated definitive confirmation testing where there was no evidence of unexpected POCT results which would justify definitive testing to confirm the unexpected result.

586.    The Verification of Treatment Form references billing for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80325 (Amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 83049 (THC-Cannabinoids); 80353 (Illicits, 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80365 (Opiates 2); 83992 (Illicits 2). A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 45**.

587.    Excell fraudulently billed Allstate $1,098.50 for these eleven (11) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected POCT results.

588.    S.C. presented to Phoenix again on February 13, 2019.

589.    S.C.'s February 13, 2019 medical record indicates that S.C.'s neurologist would not clear S.C. for any procedures until October 2019.

590.    There is no reference in S.C.'s February 13, 2019 medical record to the results of the UDT performed on November 28, 2018, despite Jones' notation that the results would be used to assess future medication therapy.

591.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

592.    Notwithstanding the absence of a discussion of the prior UDT results, Jones collected another specimen from S.C. during the February 13, 2019 follow up examination and purportedly conducted POCT.

593.    Jones subsequently billed Allstate for the February 13, 2019 presumptive testing; however, the results of said test are not detailed in S.C.'s February 13, 2019 medical record.

594.    Jones then sent S.C.'s urine specimen to Excell for definitive confirmatory testing.

595.    Upon receipt of S.C.'s specimen from Jones, Excell referred the testing to Suretox to conduct the confirmatory testing requested by Jones.

596.    According to the report attached hereto as **Exhibit 46**, Suretox used a custom panel identified as "U979 (Dr. Jones)" which includes confirmatory testing for thirty-two (32) medications/drugs.

597.    The November 30, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the "U979 (Dr. Jones)" panel were "negative," or not present in S.C.'s urine specimen.

598.    The Verification of Treatment Form for the definitive confirmatory drug testing services utilized the following eleven (11) billing codes: 80325 (Amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 83049 (THC-Cannabinoids); 80353 (Illicits, 1); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80365 (Opiates 2); 83992 (Illicits 2). A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 47**.

599.    Excell fraudulently billed Allstate $1,098.50 for these eleven (11) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected POCT results.

600.    Excell did not provide any service to S.C.

601.    Excell was not licensed to provide any service to New York Allstate Claimants.

602.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek compensation.

603.    Allstate reasonably relied upon Excell's and Jones' representations contained in the submissions of bills for services purportedly rendered to S.C.

604.    As a result, Excell and Phoenix fraudulently billed Allstate a total of $3,049.87 for treatment and testing purportedly rendered to S.C., including $2,310.34 by Excell and $739.53 by Phoenix.

f.  **Patient S.G. (Claim No. 0510134760)**

605.    Patient S.G. was allegedly involved in a motor vehicle accident on or about July 14, 2018.

606.    Patient S.G. presented to Apazidis PC on October 15, 2018 complaining of a) neck pain; b) low back pain; c) unspecified injury of muscles(s) and tendon(s) of right shoulder; d) unspecified injury of muscle(s) and tendons of the rotator cuff of left shoulder; and e) complex tear of medial meniscus, right knee.

607.    Apazidis diagnosed S.G. with a) neck pain; b) low back pain; c) unspecified injury of muscles(s) and tendon(s) of right shoulder; d) unspecified injury of muscle(s) and tendons of the rotator cuff of left shoulder; and e) complex tear of medial meniscus, right knee.

608.    During the initial consultation, Apazidis recommended a) right knee arthroscopic surgery; b) right shoulder arthroscopic surgery; and c) left shoulder steroid injection.

609.    A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Apazidis PC and submitted to Allstate through the U.S. Mail for S.G.'s October 15, 2018 Initial Consultation is attached hereto as **Exhibit 48**.

610.    S.G. presented to Apazidis on November 2, 2018 for right shoulder arthroscopic surgery.

611.    Apazidis indicated in S.G.'s November 2, 2018 medical record that S.G. was taking diclofenac sodium transdermal gel, mobic, and oxycodone-acetaminophen; there was no reference to any other medications and/or substances.

612.    Apazidis noted that UDT was needed for *pretreatment assessment*.

613.    Despite the specific reference to the need for a ***pretreatment assessment***, Apazidis disregarded his own medical plan and performed the arthroscopic shoulder surgery during the November 2, 2018 visit.

614.    None of Apazidis' subsequent reports discuss the results of the November 2, 2018 UDT.

615.    None of Apazidis' subsequent reports discuss any objective benefit or increased functional mobility as a result of the arthroscopic shoulder surgery.

616.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

617.    After proceeding with the surgery, Apazidis sent S.G.'s November 2, 2018 urine specimen to Excell for immunoassay screening and definitive confirmatory testing.

618.    The November 2, 2018 pre-printed requisition form attached hereto as **Exhibit 49**, lists no prescribed medications and requests Enzyme Immunoassay screening as well as both positive and negative confirmatory testing for opiates, benzodiazepines, methamphetamines, barbiturates, oxycodone, ETG (alcohol) and ETH (alcohol).

619.    Upon receipt of S.G.'s specimen from Apazidis, Excell referred the testing to Suretox to conduct the immunoassay screening and confirmatory testing requested by Apazidis.

85

620.     The November 5, 2018 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in requisition form were "negative," or not present in S.G.'s urine specimen. A true and accurate copy of the November 5, 2018 lab report is attached hereto as **Exhibit 50**.

621.     The Verification of Treatment Form for the definitive confirmatory drug testing services utilized the following fourteen (14) billing codes: 80307 (Drug Screen 10 Drug); 80345 (Barbiturates); 80346 (Benzodiazepines); 80348 (Opioids 7); 80348 (Opioids 3); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80364 (Opioids 1); 80361 (Opiates 2); 80367 (Opioids 5); 803772 (Opioids 2); 80373 (Opioids 6). A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.G.'s definitive confirmatory drug testing is attached hereto as **Exhibit 51**.

622.     Excell fraudulently billed Allstate $2,241.25 for these fourteen (14) screening and definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.   A true and accurate copy of the CMS 1500 Form generated by Apazidis PC and submitted to Allstate through the U.S. Mail for S.G.'s November 2, 2018 arthroscopic shoulder surgery is attached hereto as **Exhibit 52**.

623.     On December 7, 2018, S.G. presented to Apazidis, P.C. for a right knee arthroscopy.

624.     Apazidis indicated in S.G.'s December 7, 2018 medical record that S.G. was taking diclofenac sodium, mobic, and oxycodone-acetaminophen; there was no reference to any other medications and/or substances.

625.     It was noted that UDT was needed for ***pretreatment assessment***.

626.     Despite the specific reference to the need for a ***pretreatment assessment***, Apazidis disregarded his own medical plan and performed the arthroscopic knee surgery during the December 7, 2018 visit.

627.     None of Apazidis' subsequent reports discuss the results of the December 7, 2018 UDT.

628.     None of Apazidis' subsequent reports discuss any objective benefit or increased functional mobility as a result of the arthroscopic knee surgery.

629.     The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

630.     After proceeding with the surgery, Apazidis sent S.G.'s December 7, 2018 urine specimen to Excell for immunoassay screening and definitive confirmatory testing.

631.     The December 7, 2018 pre-printed requisition form attached hereto as **Exhibit 53**, has no prescribed medications and requests Enzyme Immunoassay screening as well as both positive and negative confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, ETG (alcohol) and ETH (alcohol).

632.     The December 12, 2018 lab report printed on Excell letterhead, confirmed that all of the drugs/analytes included in the requisition form were "negative," or not present in S.G.'s urine specimen. A true and accurate copy of the December 12, 2018 lab report is attached hereto as **Exhibit 54**.

633.     The Verification of Treatment Form for the definitive confirmatory drug testing services utilized the following fifteen (15) billing codes: 80307 (Drug Screen 10 Drug); 80325 (Amphetamines); 80345 (Barbiturates); 80346 (Benzodiazepines); 80348 (Opioids 7); 80364

(Opioids 3); 80356 (Illicits 3); 80358 (Opioids 4); 80359 (Illicits 4); 80361 (Opiates 1); 80364 (Opioids 1); 80365 (Opiates 2); 80367 (Opioids 5); 803772 (Opioids 2); 80373 (Opioids 6). A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.G.'s definitive confirmatory drug testing is attached hereto as **Exhibit 55**.

634.    Excell fraudulently billed Allstate $2,372.50 for these fifteen (15) screening and definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.  A true and accurate copy of the CMS 1500 Form generated by Apazidis PC and submitted to Allstate through the U.S. Mail for S.G.'s December 7, 2018 arthroscopic knee surgery is attached hereto as **Exhibit 56**.

635.    On the dates when Apazidis referred S.G.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

636.    Excell unlawfully billed Allstate for UDT services for S.G. performed by Suretox.

637.    Excell was not licensed to perform definitive confirmatory testing for S.G.

638.    Excell unnecessarily facilitated definitive confirmation testing, as there is no evidence of unexpected immunoassay screening results which would justify definitive testing to confirm the unexpected result.

639.    Excell did not provide any service to S.G.

640.    Excell was not licensed to provide any service to New York Allstate Claimants.

641.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

642.     Allstate reasonably relied upon Excell's, Apazidis PC's, and Apazidis' representations contained in the submissions of bills for services purportedly rendered to S.G.

643.     As a result, Excell and Apazidis PC fraudulently billed Allstate a total of $26,195.44 for treatment and testing purportedly rendered to S.G., including $4,613.75 by Excell, and $21,581.69 by Apazidis PC.

### g.   Claimant J.G. (Claim No. 0469022818)

644.     Patient J.G. was allegedly involved in a motor vehicle accident on July 30, 2017.

645.     J.G. presented to Apazids, PC for a new patient consultation on October 2, 2017 complaining of right knee pain, neck pain, back pain, and right shoulder pain.

646.     Apazidis diagnosed J.G. with a) neck pain; b) low back pain; c) impingement syndrome of right shoulder; and d) other tear of unspecified meniscus, right knee.

647.     Apazidis indicated in J.G.'s October 2, 2017 medical record that J.G. was not taking any medications.

648.     Apazidis' treatment plan included a right knee and right shoulder arthroscopic surgery.  It was noted that urine testing was needed for *pretreatment* assessment.

649.     Despite the specific reference to the need for a *pretreatment* assessment, Apazidis disregarded his own medical plan and performed the knee arthroscopic surgery during a subsequent visit on October 4, 2017.

650.     None of Apazidis' subsequent reports discuss the results of the treatment or testing performed on October 4, 2017.

651.     The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

652.    After proceeding with the surgery, Apazidis sent J.G.'s October 4, 2017 urine specimen to Excell for immunoassay screening and definitive confirmatory testing.

653.    The October 4, 2017 pre-printed requisition form attached hereto as **Exhibit 57**, has no prescribed medications and no tests selected.

654.    Upon receipt of J.G.'s specimen from Apazidis, Excell referred the testing to Suretox to conduct the screening and confirmatory testing requested by Apazidis.

655.    Suretox performed an immunoassay screening panel and definitive confirmatory tests for benzodiazepines, illicit drugs, opiates, opioids, amphetamines, psychoactive, relaxants, TCA, THC-cannabinoids, barbiturates, and alcohol.

656.    The October 9, 2018 lab report, printed on Excell's letterhead, confirmed that all of the tested drugs/analytes except alcohol were "negative," or not present in J.G.'s urine specimen. A true and accurate copy of the October 9, 2018 lab report is attached hereto as **Exhibit 58**.

657.    Excell unlawfully billed Allstate for UDT services for J.G. performed by Suretox.

658.    Excell was not licensed to perform definitive confirmatory testing to J.G.

659.    Excell unnecessarily facilitated definitive confirmation testing, as there is no evidence of unexpected immunoassay screening results which would justify definitive testing to confirm the unexpected result.

660.    The Health Insurance Claim form used to bill Allstate for the UDT services utilized the following twenty-six (26) billing codes: 80358; 80367; 80373; 80354; 80359; 80361; 80365; 80364; 80358; 80307; 80346; 80356; 83992; 80353; 80324; 80348; 80372; 80325; 80323; 80368; 80370; 80337; 80349; 80350; 80345; 80320; and 80321). A true and accurate copy of the Health Insurance claim form generated by Excell (for services actually rendered by Suretox) and

submitted to Allstate through the U.S. Mail for J.G.'s definitive confirmatory drug testing is attached hereto as **Exhibit 59**.

661.   Excell fraudulently billed Allstate $3,996.00 for these twenty-six (26) CPT codes for testing that was unnecessarily performed due to the absence of unexpected immunoassay screening results.

662.   Excell did not provide any service to J.G.

663.   Excell was not licensed to provide any service to New York Allstate Claimants.

664.   Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek compensation.

665.   Allstate reasonably relied upon Excell's and Apazidis' representations contained in the submissions of bills for services purportedly rendered to J.G.

666.   As a result, Excell and Apazidis PC fraudulently billed Allstate a total of $12,259.74 for treatment and testing purportedly rendered to J.G., including $3,996.00 by Excell and $8,263.74 by Apazidis PC.

### h.   **Claimant F.C. (Claim No. 0472657971)**

667.   Patient F.C. was allegedly involved in a motor vehicle accident on August 30, 2017.

668.   F.C. presented to Apazidis PC on November 20, 2017 for an initial consultation.

669.   F.C. complained of a) left knee pain; b) shoulder pain; c) left side pain; and d) pain in joints of fingers.

670.   Apazidis ordered an MRI to rule out any musculoskeletal pathology.

671.   F.C. presented to Apazidis PC again on November 22, 2017 for a follow up visit.

672.    It was noted that Apazidis was unable to load the MRI discs on the computer and MRI reports were not yet available, so a second follow up visit was scheduled.

673.    Patient F.C. was seen again by Apazidis on November 30, 2017.

674.    Apazidis diagnosed F.C. with a) impingement syndrome of left shoulder; b) unspecified internal derangement of left knee; and c) other tear of unspecified tibia.

675.    Apazidis indicated in F.C.'s November 30, 2017 medical record that F.C. was currently taking no medication.

676.    Apazidis' treatment plan included a left shoulder arthroscopic surgery.  It was noted that testing was needed for ***pretreatment assessment.***

677.    Despite the specific reference to the need for a pretreatment assessment, Apazidis disregarded his own medical plan and performed the left shoulder arthroscopic surgery on December 1, 2017.

678.    None of Apazidis' subsequent reports discuss the results of the December 1, 2017 UDT.

679.    None of Apazidis' subsequent reports discuss any objective benefit or increased functional mobility as a result of the left shoulder arthroscopic surgery.

680.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

681.    Apazidis sent F.C.'s urine specimen to Excell for Immunoassay screening and definitive confirmatory testing. A true and accurate copy of the December 1, 2017 requisition form submitted by Apazidis to Excell is attached hereto as **Exhibit 60**.

92

682.    Upon receipt of F.C.'s specimen from Apazidis, Excell referred the testing to Suretox to conduct the screening and confirmatory testing requested by Apazidis.

683.    According to the report, attached hereto as **Exhibit 61**, Suretox performed testing for sixty-four (64) medications/drugs.

684.    The December 1, 2017 lab report, printed on Excell's letterhead, confirmed that all but one of the sixty-six (66) drugs/analytes tested were "negative," or not present in F.C.'s urine specimen.

685.    F.C. tested positive for Ethyl glucuronide, which is commonly known as alcohol.

686.    Excell unnecessarily facilitated definitive confirmation testing, as there is evidence of only one unexpected immunoassay screening result; however, there was no evidence of unexpected results for the other 63 substances which would justify definitive testing to confirm the unexpected result.

687.    A true and accurate copy of the Health Insurance Claim Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for F.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 62**.

688.    Excell fraudulently billed Allstate $3,996 for these twenty-seven (27) presumptive screening and definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.

689.    The CMS 1500 Form for the presumptive screening and definitive confirmatory drug testing services utilized the following twenty-seven (27) billing codes: 80307; 80346; 80356; 83992; 80353; 80324; 80359; 80361; 80365; 80364; 80358; 80367; 80373; 80354; 80348; 80372; 80325; 80323; 80368; 80370; 80337; 80349; 80350; 80345; 80320; 80321. *See* **Exhibit 63**.

690.    Patient F.C. once again presented to Apazidis PC on January 12, 2018.

691.     Apazidis diagnosed F.C. with a left knee meniscal tear.

692.     Apazidis' treatment plan included a left knee arthroscopic surgery.  It was noted that testing was needed for ***pretreatment assessment.***

693.     Despite the specific reference to the need for a pretreatment assessment, Apazidis disregarded his own medical plan and performed the left knee arthroscopic surgery on January 12, 2018.

694.     None of Apazidis' subsequent reports discuss the results of the January 12, 2018 UDT.

695.     None of Apazidis' subsequent reports discuss any objective benefit or increased functional mobility as a result of the left knee arthroscopic surgery.

696.     The absence of any discussion, review, or patient knowledge of testing and associated treatment demonstrates the lack of impact on patient care and therefore the lack of medical necessity.

697.     After proceeding with the surgery, Apazidis sent F.C.'s January 12, 2018 urine specimen to Excell for Immunoassay screening and definitive confirmatory testing.

698.     Upon receipt of F.C.'s specimen from Apazidis, Excell referred the testing to Suretox, to conduct the screening and confirmatory testing requested by Apazidis.

699.     According to the report, attached hereto as **Exhibit 64**, Suretox performed testing for sixty-six (66) medications/drugs.

700.     The January 17, 2018 lab report printed on Excell letterhead, confirmed that all but one of the sixty-sixty (66) drugs/analytes tested were "negative," or not present in F.C.'s urine specimen.

701.     Excell unnecessarily facilitated definitive confirmation testing, as there is evidence of only one unexpected immunoassay screening result; however, there was no evidence of unexpected results for the sixty-six (66) substances which would justify definitive testing to confirm the unexpected result.

702.     A true and accurate copy of the Health insurance Claim Form or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for F.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 65**.

703.     The CMS 1500 Form for the presumptive screening and definitive confirmatory drug testing services utilized the following twenty-five (25) billing codes: 80307; 80346; 80356; 80353; 80359; 83992; 80361; 80365; 80364; 80348; 80354; 80358; 80367; 80372; 80325; 80323; 80368; 80370; 80337; 80349; 80350; 80345; and 80321. *See* **Exhibit 66**.

704.     Excell fraudulently billed Allstate $3,129.75 for these twenty-five (25) presumptive screening and definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.

705.     Allstate reasonably relied upon Excell's and Apazidis' representations contained in the submissions of bills for services purportedly rendered to F.C.

706.     On the dates when Apazidis referred F.C.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

707.     Excell unlawfully billed Allstate for UDT services for F.C. performed by Suretox.

708.     Excell was not licensed to perform definitive confirmatory testing for F.C.

709.     Excell did not provide any service to F.C.

710.     Excell was not licensed to provide any service to New York Allstate Claimants.

711.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

712.    Allstate reasonably relied upon Apazidis PC's and Apazidis' representations contained in the submissions of bills for services purportedly rendered to F.C.

713.    As a result, Excell and Apazidis PC fraudulently billed Allstate a total of $25,162.62 for treatment and testing purportedly rendered to F.C., including $7,095.75 by Excell and $18,036.87 by Apazidis PC.

### i.   Patient J.M. (Claim No. 0481232320)

714.    Patient J.M. was allegedly involved in a motor vehicle accident on November 7, 2017.

715.    J.M. presented to Kotkes PC on November 29, 2017 complaining of a) neck pain and stiffness; b) back pain and stiffness; and c) shoulder pain and stiffness.

716.    J.M. was diagnosed with a) cervical disc herniations; b) cervical disc bulges; c) cervical radiculopathy; d) cervical facet syndrome; e) lumbar disc herniations; f) lumbar disc bulges; g) lumbar radiculopathy; h) lumbar facet syndrome; i) myalgia, myofascial pain; j) sacroiliitis; k) internal derangement of the left and right shoulder; and l) internal derangement of the left and right knee.

717.    Kotkes' treatment plan included a) physical therapy; b) prescription pain medication, pain creams, urine toxicology testing; c) cervical medial branch nerve blocks with fluoroscopy, bilateral C4-C7, bilateral, series of 2; d) cervical epidural injections with fluoroscopy; e) diagnostic cervical epidurography; f) lumbar medial branch nerve blocks with fluoroscopy, bilateral L2-Ala, 2 sessions; g) lumbar epidural steroid injections with fluoroscopy; h) diagnostic

lumbar epidurography; i) lumbar discogram and percutaneous discectomy surgery may be indicated for refractory pain; j) sacroiliac joint injections with fluoroscopy; k) ultrasound guided trigger point injections, tendon injections, joint injections and nerve blocks; and l) orthopedic neurology, and physiatry consultation.

718.    J.M.'s November 29, 2017 medical report indicates that J.M. was not taking any medications.

719.    Kotkes sent J.M.'s November 29, 2017 urine specimen to Excell for immunoassay screening and definitive confirmatory testing.

720.    The November 29, 2017 requisition form attached hereto as **Exhibit 67**, has no prescribed medications and requests immunoassay screening as well as confirmatory testing for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, buprenorphine methadone, carisoprodol, heroin, and cocaine, PCP, THC and MDMA.

721.    The requisition form dated November 29, 2017 also requests positive confirmatory testing for morphine, codeine, meperidine, tramadol, fentanyl, tapentadol, pentazocine, meprobamate, propoxyphene, and kratom.

722.    Additionally, the requisition form dated November 29, 2017 requests presumptive screening for ETG, ETH, Spice K2, MCA, ad Morphine.

723.    Upon receipt of J.M.'s November 29, 2017 specimen from Kotkes, Excell referred the testing to Suretox to conduct the screening and confirmatory testing requested by Kotkes.

724.    According to the report attached hereto as **Exhibit 68**, Suretox used a panel identified as "Urine Toxicology" which includes confirmatory testing for sixty-six (66) medications/drugs.

725.    The December 4, 2017 lab report, printed on Excell's letterhead, confirmed that all of the medications/drugs included in the "Urine Toxicology" panel were "negative," or not present in J.M.'s urine specimen.

726.    Excell unlawfully billed Allstate for UDT services for J.M. performed by Suretox.

727.    Excell was not licensed to perform definitive confirmatory testing for J.M.

728.    Excell unnecessarily facilitated definitive confirmation testing, as there is no evidence of unexpected immunoassay screening results which would justify definitive testing to confirm the unexpected result.

729.    The Health Insurance Claim Form for the definitive confirmatory drug testing services utilized the following twenty-six (26) billing codes: 80307; 80346; 80356; 83992; 80353; 80324; 80359; 80361; 80365; 80364; 80358; 80367; 80373; 80354; 80348; 80372; 80325; 80323; 80368; 80370; 80337; 80349; 80350; 80345; 80320; 80321. A true and accurate copy of the Health Insurance Claim Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for J.M.'s definitive confirmatory drug testing is attached hereto as **Exhibit 69**.

730.    Excell billed Allstate $3,996.00 for these twenty-six (26) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.

731.    Excell did not provide any service to J.M.

732.    Excell was not licensed to provide any service to New York Allstate Claimants.

733.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek compensation.

734.    Allstate reasonably relied upon Excell's and Apazidis' representations contained in the submissions of bills for services purportedly rendered to J.M.

735.    As a result, Excell and Kotkes PC fraudulently billed Allstate a total of $4,295.00 for treatment and testing purportedly rendered to J.M., including $3996.00 by Excell and $299.00 by Kotkes PC.

**j.   Patient C.C. (Claim No. 0481423374)**

736.    Patient C.C. was allegedly involved in a motor vehicle accident on November 7, 2017.

737.    C.C. presented to Kotkes PC for an initial consultation on November 29, 2017 complaining of a) back pain; b) left knee pain; and c) right shoulder pain.

738.    Kotkes diagnosed C.C. with a) cervical disc herniations; b) cervical disc bulges; c) cervical radiculopathy; d) cervical facet syndrome; e) lumbar disc herniations; f) lumbar disc bulges; g) lumbar radiculopathy; h) lumbar facet syndrome; i) myalgia; j) sacrocitis; k) internal derangement of the left and right shoulder; and l) internal derangement of the left and right knee.

739.    Kotkes' treatment plan included a) physical therapy three times a week; b) medication; c) urine drug tests; d) limit, restrict activities that provoke pain; e) diagnostic cervical medical branch nerve blocks with fluoroscopy, bilateral C4-C7, bilateral, series of 2; e) cervical epidural injections with fluoroscopy, series of 3; f) diagnostic lumbar medial branch nerve blocks with fluoroscopy, bilateral L2-Ala, 2 sessions; g) lumbar epidural steroid injections with fluoroscopy, series of 3; h) lumbar discogram and percutaneous discectomy surgery if indicated; i) sacroiliac joint injections; and j) trigger point injections.

740.    Kotkes noted that C.C.'s medications were unknown in the November 29, 2017 medical record.

741.    However, Kotkes prescribed C.C. with Cyclobenzaprine HCL during the November 29, 2017 visit. A true and accurate copy of the medication order is attached hereto as **Exhibit 70**.

742.    None of Koktes' subsequent reports discuss the results of the November 29, 2017 UDT.

743.    The absence of any discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

744.    Kotkes sent C.C.'s November 29, 2017 urine specimen to Excell for immunoassay screening and definitive confirmatory testing.

745.    At the date of Kotkes' referral to Excell for UDT, Excell was not licensed to do business in New York.

746.    Upon receipt of C.C.'s specimen from Kotkes, Excell referred the testing to Suretox to conduct the screening and confirmatory testing requested by Kotkes.

747.    According to the report attached hereto as **Exhibit 71**, Suretox performed extensive testing, including confirmatory testing for sixty-five (65) medications/drugs.

748.    The December 4, 2017 lab report, printed on Excell's letterhead, confirmed that all of the drugs/analytes included in the "Urine Toxicology" panel were "negative," or not present in C.C.'s urine specimen.

749.    Excell unlawfully billed Allstate for UDT services for C.C. performed by Suretox.

750.    Excell was not licensed to perform definitive confirmatory testing for C.C.

751.    Excell unnecessarily facilitated definitive confirmation testing, as there is no evidence of unexpected Immunoassay screening results which would justify definitive confirmatory testing to confirm the unexpected result.

752.    The Health Insurance Claim Form for the definitive confirmatory drug testing services utilized the following twenty-five (25) billing codes: 80307; 80346; 80356; 83992; 80353; 80324; 80359; 80361; 80365; 80364; 80358; 80367; 80373; 80354; 80372; 80325; 80323; 80368; 80370; 80337; 80349; 80350; 80345; 80320; 80321. A true and accurate copy of the Health Insurance Claim Form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for C.C.'s definitive confirmatory drug testing is attached hereto as **Exhibit 72**.

753.    Excell billed Allstate $3,996.00 for these twenty-five (25) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected Immunoassay Screening results.

754.    Excell did not provide any service to C.C.

755.    Excell was not licensed to provide any service to New York Allstate Claimants.

756.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek compensation.

757.    Allstate reasonably relied upon Excell's and Kotkes' representations contained in the submissions of bills for services purportedly rendered to C.C.

758.    As a result, Excell and Kotkes PC fraudulently billed Allstate a total of $5,215.02 for treatment and testing purportedly rendered to C.C., including $3,996.00 by Excell and $1,219.02 by Kotkes PC.

### k.   **Patient A.F. (Claim No. 0491277315)**

759.     Patient A.F. was allegedly involved in a motor vehicle accident on or about January 24, 2018.

760.     A.F. initially presented to Kotkes PC on May 22, 2018 complaining of neck pain that was worse with movement and associated with stiffness.

761.     Kotkes diagnosed A.F. with cervicalgia during the initial visit on May 22, 2018.

762.     At the same time, Kotkes performed a cervical epidural steroid injection with fluoroscopic guidance.

763.     A true and accurate copy of the Verification of Treatment by Attending Physician or Provider of Health services form generated by Kotkes PC and submitted to Allstate through the U.S. Mail for A.F.'s May 22, 2018 epidural injection is attached hereto as **Exhibit 73**.

764.     In his operative report, Kotkes references A.F.'s self-reported medications but makes no reference to the UDT he ordered prior to the injection.

765.     Despite discussion of A.F.'s self-reported medications, Kotkes performed the epidural injection at the May 22, 2018 visit.

766.     None of Kotkes' subsequent reports discuss the results of the May 22, 2018 UDT.

767.     Kotkes submitted both a Preoperative Note and a Postoperative Note.   Both reference the need and purported justification for future injections, but not UDT.

768.     The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

769.     Kotkes then sent A.F.'s urine specimen to Excell to perform an enzyme immunoassay screening.

770. The May 22, 2018 pre-printed requisition form attached hereto as **Exhibit 74**, has no prescribed medications and requests Enzyme Immunoassay screening for opiates, benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, buprenorphine, methadone, carisoprodol, 6-MAM (heroin), Cocaine, PCP, THC, MDMA, ETG (Alcohol), ETH (Alcohol), spice K2, and TCA.

771. Upon receipt of A.F's May 22, 2018 specimen from Kotkes, Excell referred the testing to Suretox to conduct the immunoassay screening requested by Kotkes.

772. The May 25, 2018 lab report, printed on Excell's letterhead, reported that all of the drugs/analytes included in the requisition form were "negative," or not present in A.F.'s urine specimen. A true and accurate copy of the May 25, 2018 lab report is attached hereto as **Exhibit 75**.

773. The Verification of Treatment Form for UDT services utilized one (1) billing code: 80307.  A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for A.F.'s UDT is attached hereto as **Exhibit 76**.

774. Excell fraudulently billed Allstate $850.00 for this one (1) screening testing CPT code that was unnecessarily performed.

775. On June 5, 2018, A.F. presented to Kotkes with neck pain, which was reportedly worse with bending and associated with stiffness.

776. Kotkes diagnosed A.F. with a) cervicalgia; b) panniculitis affecting regions of the neck & back, sacral and sacrococygeal region; and c) possible cervical facetogenic pain.

777. Kotkes performed bilateral cervical medial branch blocks at the June 5, 2018 visit.

778.     A true and accurate copy of the Verification of Treatment by Attending Physician or Provider of Health services form generated by Kotkes PC and submitted to Allstate through the U.S. Mail for A.F.'s June 5, 2018 branch block injection is attached hereto as **Exhibit 77**.

779.     Kotkes submitted both a Preoperative Note and a Postoperative Note.   Both reference the need and purported justification of future injections.

780.     In fact, Kotkes' Postoperative Note indicates cervical medial branch block #1 with 80% improvement for over 1 hour and improved range of motion and A.F. was scheduled for a subsequent medial branch block.

781.     The June 5, 2018 medical record did not discuss any of A.F.'s medications.

782.     So little time elapsed between the May 22, 2018 procedure and the June 5, 2018 procedure, it is difficult to ascertain whether any benefit was achieved from the preceding injection. Therefore, in this case, the injections were performed in such an overlapping fashion that no objective response to treatment could be determined.

783.     Moreover, despite these multiple repeated injections, there is not a single objective instance of documentation of response to treatment, treatment outcomes, or alteration of care in response to treatment.

784.     The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

785.     After proceeding with the injection, Kotkes sent A.F.'s June 5, 2018 urine specimen to Excell to perform an enzyme immunoassay screening.

786.     The June 5, 2018  pre-printed requisition form attached hereto as **Exhibit 78**, has no prescribed medications and requests Enzyme Immunoassay screening for opiates,

benzodiazepines, amphetamines, methamphetamines, barbiturates, oxycodone, buprenorphine, methadone, carisoprodol, 6-MAM (heroin), cocaine, PCP, THC, MDMA, ETG (Alcohol), ETH (Alcohol), spice K2, and TCA.

787.    Upon receipt of A.F's specimen from Kotkes, Excell referred the testing to Suretox to conduct the immunoassay screening requested by Kotkes.

788.    The June 8, 2018 lab report, printed on Excell's letterhead, reported that all of the drugs/analytes included in the requisition form were "negative," or not present in A.F.'s urine specimen. A true and accurate copy of the June 8, 2018 lab report is attached hereto as **Exhibit 79**.

789.    None of Kotkes' subsequent reports discuss the results of the June 5, 2018 UDT.

790.    The Verification of Treatment Form for the UDT services utilized one (1) billing code: 80307.  A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for A.F.'s UDT is attached hereto as **Exhibit 80**.

791.    Excell fraudulently billed Allstate $850.00 for this one (1) screening testing CPT code that was unnecessarily performed.

792.    On June 12, 2018, A.F. presented to Kotkes for a bilateral cervical facet radiofrequency rhizotomy/radiofrequency ablation.

793.    A true and accurate copy of the Verification of Treatment by Attending Physician or Provider of Health services form generated by Kotkes PC and submitted to Allstate through the U.S. Mail for A.F.'s June 12, procedure is attached hereto as **Exhibit 81**.

794.    Kotkes collected a urine specimen from A.F. at this time.

795.    So little time elapsed between the June 5, 2018 injection procedure and the June 12, 2018 rhizotomy procedure, it is difficult to ascertain whether any benefit was achieved from the preceding injection. Therefore, in this case, the procedures were performed in such an overlapping fashion that no objective response to treatment could be determined.

796.    Moreover, despite multiple repeated injections and pain management procedures, there is not a single objective instance of documentation of response to treatment, treatment outcomes, or alteration of care in response to treatment.

797.    None of Kotkes' subsequent reports discuss the results of the June 12, 2018 UDT.

798.    None of Kotkes' subsequent reports discuss any objective benefit or increased functional mobility as a result of the June 12, 2018 procedure.

799.    The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

800.    Kotkes sent A.F.'s June 12, 2018 urine specimen to Excell to perform an enzyme immunoassay screening.

801.    The June 12, 2018 pre-printed requisition form attached hereto as **Exhibit 82**, has no prescribed medications and has no drugs/analytes selected for any type of testing.

802.    Upon receipt of A.F's specimen from Kotkes, Excell referred the testing to Suretox to conduct the immunoassay screening requested by Kotkes.

803.    The June 15, 2018 lab report, printed on Excell's letterhead, reported that oxycodone, opiates, benzodiazepines, MDMA, buprenorphine, 6-acetylmorphine, ethyl glucuronide, amphetamines, cocaine metabolite, THC, methadone, barbiturates, TCA, and PCP

were "negative," or not present in A.F.'s urine specimen. A true and accurate copy of the June 15, 2018 lab report is attached hereto as **Exhibit 83**.

804. None of Kotkes' subsequent reports discuss the results of the June 12, 2018 UDT.

805. The Verification of Treatment Form for the UDT services utilized one (1) billing code: 80307. A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for A.F.'s UDT is attached hereto as **Exhibit 84**.

806. Excell fraudulently billed Allstate $850.00 for this one (1) screening testing CPT code that was unnecessarily performed.

807. On the dates when Kotkes referred A.F.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

808. Excell unlawfully billed Allstate for UDT services for A.F. performed by Suretox.

809. Excell was not licensed to perform definitive confirmatory testing for A.F.

810. Excell unnecessarily facilitated urine testing as there is no evidence Kotkes used the results to influence his treatment plan.

811. Excell did not provide any service to A.F.

812. Excell was not licensed to provide any service to New York Allstate Claimants.

813. Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

814. Allstate reasonably relied upon Excell's, Kotkes PC's, and Kotkes' representations contained in the submissions of bills for services purportedly rendered to A.F.

815.    As a result, Excell and Apazidis PC fraudulently billed Allstate a total of $8,411.29 for treatment and testing purportedly rendered to A.F., including $2,550.00 by Excell, and $5,861.29 by Kotkes PC.

### l.   Patient S.B. (Claim No. 0485758411)

816.    Patient S.B. was allegedly involved in a motor vehicle accident on or about December 12, 2017.

817.    S.B. presented to Kotkes PC on March 5, 2018 complaining of a) neck pain and stiffness; and b) back pain and stiffness.

818.    Kotkes diagnosed S.B. with a) cervical spine sprain; b) lumbar disc herniation with radiculopathy; and c) myalgia, myofascial pain.

819.    During the initial consultation, Kotkes recommended a) physical therapy; b) cyclobenzaprine; c) tramadol; d) urine toxicology screening & confirmation to guide prescription medication; e) trigger point injections with ultrasound guidance; f) epidural injections; g) lumbar discogram; and h) percutaneous discectomy.

820.    At the initial consultation, Kotkes performed a myofascial trigger point injection.

821.    A true and accurate copy of the Verification of Treatment by Attending Physician or other provider of Health Services form generated by Kotkes PC and submitted to Allstate through the U.S. Mail for S.B.'s March 5, 2018 visit and procedure is attached hereto as **Exhibit 85**.

822.    None of Kotkes' subsequent reports discuss the results of the March 5, 2018 UDT.

823.    None of Kotkes' subsequent reports discuss any objective benefit or increased functional mobility as a result of the injection.

108

824.    The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

825.    Kotkes sent S.B.'s March 5, 2018 urine specimen to Excell for definitive confirmatory testing of twenty-two (22) drugs/analytes.

826.    Upon receipt of S.B.'s specimen from Kotkes, Excell referred the testing to Suretox to conduct the definitive confirmatory testing requested by Kotkes.

827.    The March 8, 2018 lab report, printed on Excell's letterhead, confirmed that all of the tested drugs/analytes were "negative," or not present in S.B.'s urine specimen. A true and accurate copy of the March 8, 2018 lab report is attached hereto as **Exhibit 86**.

828.    The Health insurance claim form for the definitive confirmatory drug testing services utilized the following six (6) billing codes: 80346; 80356; 80361; 80365; and 80348.  A true and accurate copy of the Health Insurance claim form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.B.'s definitive confirmatory drug testing is attached hereto as **Exhibit 87**.

829.    Excell fraudulently billed Allstate $735.00 for these six (6) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.

830.    On March 13, 2018, S.B. presented to Kotkes for diagnostic lumbar disc injections with radiographic interpretation.

831.    So little time elapsed between the March 5, 2018 injection procedure and the March 13, 2018 injection procedure, it is difficult to ascertain whether any benefit was achieved from the

preceding injection. Therefore, in this case, the injections were performed in such an overlapping fashion that no objective response to treatment could be determined.

832.    Moreover, despite these multiple repeated injections, there is not a single objective instance of documentation of response to treatment, treatment outcomes, or alteration of care in response to treatment.

833.    Kotkes did not note any current medications in S.B.'s March 13, 2018 medical record.

834.    None of Kotkes' subsequent reports discuss the results of the March 13, 2018 UDT.

835.    None of Kotkes' subsequent reports discuss any objective benefit or increased functional mobility as a result of the procedure.

836.    The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that the treatment had no real impact on patient care, and was therefore medically unnecessary.

837.    Kotkes sent S.B.'s March 13, 2018 urine specimen to Excell for enzyme immunoassay screening and definitive confirmatory testing.

838.    Upon receipt of S.B.'s specimen from Kotkes, Excell referred the testing to Suretox to conduct the definitive confirmatory testing requested by Kotkes.

839.    The March 16, 2018 lab report, printed on Excell's letterhead, confirmed that all of the tested drugs/analytes were "negative," or not present in S.B.'s urine specimen. A true and accurate copy of the March 16, 2018 lab report is attached hereto as **Exhibit 88**.

840.    The Health insurance claim form for the definitive confirmatory drug testing services utilized the following eight (8) billing codes: 80307; 80364; 80348; 80354; 80358; 80367; 80372; and 80373.

841.   Excell fraudulently billed Allstate $1,558.75 for these eight (8) definitive confirmatory testing CPT codes that were unnecessarily performed due to the absence of unexpected immunoassay screening results.  A true and accurate copy of the Health Insurance claim form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.B.'s definitive confirmatory drug testing is attached hereto as **Exhibit 89**.

842.   On March 19, 2018, S.B. presented to Kotkes for a discectomy.

843.   So little time elapsed between the March 13, 2018 injection procedure and the March 19, 2018 discectomy, it is difficult to ascertain whether any benefit was achieved from the preceding injection. Therefore, in this case, these procedures were performed in such close proximity that no objective response to treatment could be determined.

844.   Moreover, despite multiple repeated injections and surgical interventions, there is not a single objective instance of documentation of response to treatment, treatment outcomes, or alteration of care in response to treatment.

845.   Kotkes did not note any current medications in S.B.'s March 19, 2018 medical record.

846.   None of Kotkes' subsequent reports discuss the results of the March 19, 2018 UDT.

847.   None of Kotkes' subsequent reports discuss any objective benefit or increased functional mobility as a result of the procedure.

848.   The absence of discussion, review, or patient knowledge of this testing and associated treatment demonstrates that this treatment had no real impact on patient care, and was therefore medically unnecessary.

849.    Kotkes sent S.B.'s March 19, 2018 urine specimen to Excell for enzyme immunoassay screening.

850.    Upon receipt of S.B.'s specimen from Kotkes, Excell referred the testing to Suretox to conduct the definitive confirmatory testing requested by Kotkes.

851.    The March 22, 2018 lab report, printed on Excell's letterhead, reported that all tested drugs/analytes were "negative" or not present in S.B.'s specimen. A true and accurate copy of the March 22, 2018 lab report is attached hereto as **Exhibit 90**.

852.    A true and accurate copy of the Health Insurance claim form generated by Excell (for services actually rendered by Suretox) and submitted to Allstate through the U.S. Mail for S.B.'s immunoassay drug screening is attached hereto as **Exhibit 91**.

853.    The Health insurance claim form for the definitive confirmatory drug testing services utilized the following one (1) billing code: 80307.

854.    Excell fraudulently billed Allstate $850.00 for this one (1) CPT code for testing that was unnecessarily performed.

855.    On the dates when Kotkes referred S.B.'s specimens to Excell for UDT, Excell was not licensed to do business in New York.

856.    Excell unlawfully billed Allstate for UDT services for S.B. performed by Suretox.

857.    Excell was not licensed to perform definitive confirmatory testing for S.B.

858.    Excell unnecessarily facilitated definitive confirmation testing as there is no evidence of unexpected immunoassay screening results which would justify definitive testing to confirm the unexpected result.

859.    Excell did not provide any service to S.B.

860.    Excell was not licensed to provide any service to New York Allstate Claimants.

112

861.    Because Suretox actually rendered the testing services, Excell is not permitted to seek New York No-Fault payments from Allstate because the Worker's Compensation Fee Schedule only permits the lab that actually provided testing services to seek reimbursement.

862.    Allstate reasonably relied upon Excell's, Kotkes PC's, and Kotkes' representations contained in the submissions of bills for services purportedly rendered to S.B.

863.    As a result, Excell and Kotkes PC fraudulently billed Allstate a total of $18,238.82 for treatment and testing purportedly rendered to S.B., including $3,143.75 by Excell, and $15,095.07 by Kotkes PC.

## X.    SPECIFIC ALLEGATIONS OF MISREPRESENTATION MADE TO AND RELIED ON BY ALLSTATE

### A.    MISREPRESENTATIONS BY THE DEFENDANTS

864.    To induce Allstate to pay promptly their fraudulent charges for (1) UDT falsely billed by Excell for services performed by Suretox; (2) UDT fraudulently billed by Excell when it was not properly licensed; (3) UDT fraudulently billed by Excell when it was not authorized to do business in New York; (4)  unnecessary testing; and (5) fraudulently-billed testing, the Defendants submitted or caused to be submitted to Allstate documentation, including but not limited to bills, invoices, medical records (lab reports), and the medical necessity form, that materially misrepresented that the UDT performed was actually provided and was medically necessary as required by New York No-Fault Law.

865.    As discussed throughout this pleading, the full extent of misrepresentations contained in the bills submitted to Allstate by the Defendants only became known to Allstate upon its investigation of the Defendants, including discovery of the number of drugs/drug classes contained in each panel preference and the Defendants' refusal to permit Referring Provider Defendants to request that only necessary UDT be done.

866. None of these facts is evident within the four corners of the documents submitted to Allstate by the Defendants and upon which Allstate relied in adjusting the claims and tendering payment.

867. Claims under the New York No-Fault Act can only be submitted for reasonably necessary services for an injured person's care, recovery, or rehabilitation.

868. Thus, every time Excell, at the direction of its officer and manager, Belotserkovsky, submitted bills and lab reports to Allstate supporting its claims for No-Fault benefits, the Defendants necessarily warranted that such bills and medical records related to necessary testing that was actually requested.

869. The full extent of the Defendants' fraudulent acts—including billing for performing unnecessary and excessive confirmation testing and using fraudulent billing practices—was not and could not have been known to Allstate until it commenced its investigation of the Defendants shortly before filing this Complaint.

870. In particular, the Defendants took advantage of the technical complexity and esoteric nature of the UDT Excell allegedly performed to mask their fraudulent billing.

871. Moreover, Allstate is obligated to pay or deny claims received from providers within a short period of time.

872. As such, and given the number of bills received by Allstate every day, Allstate cannot scrutinize every bill it receives and must at times rely on the submitting provider to comply with the law and submit only valid claims for No- Fault benefits.

873. This is particularly true where the provider (here, Excell) submits claims for specialized services such as clinical laboratory UDT, which requires a level of expertise to perform and bill for that exceeds the knowledge of the typical insurance claims adjuster.

114

874.     Excell falsely represented that it provided services to Allstate claimants when in fact the services were provided by Suretox.

875.     Excell falsely represented that it was licensed to bill for UDT services in New York.

876.     Excell falsely represented that it has authority to do business in the state of New York.

877.     The defendants falsely represented the necessity for unnecessary and excessive UDT to every claim at issue herein.

878.     Thus, each claim for payment (and accompanying medical records) under New York's No-Fault Laws sent to Allstate by or at the direction of the Defendants constitutes a misrepresentation because the treatment underlying the claim was not medically necessary, which it must be in order for a service to be compensable under New York Law.

879.     The UDT rendered by, and at the direction of, the Excell Defendants was not lawful and every claim for payment submitted to Allstate through the U.S. Mail misrepresented this fact.

880.     Moreover, each bill submitted to Allstate by or on behalf of the Defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

881.     Through the submission of lab reports, invoices, bills, standard form letters of medical necessity, and other medical documentation to Allstate via the U.S. Mail, the Defendants attested to the fact and medical necessity of the drug testing for which they billed Allstate.

882.     As the Defendants did not render reasonably necessary drug testing and engaged in fraudulent billing practices, each bill and accompanying documentation submitted by Excell (at

the direction and with the knowledge of its officers and managers) to Allstate constitutes a material misrepresentation.

883. Furthermore, the Referring Provider Defendants submitted standard form statements of medical necessity to justify excessive and medically unnecessary testing.

884. The Referring Provider Defendants are licensed medical professionals, and signed numerous letters submitted to Allstate falsely attesting to the medical necessity of the UDT at issue herein.

885. In addition to submitting referrals for unnecessary UDT, the Referring Provider Defendants administered extensive treatment including various types of injections and arthroscopic procedures without allowing the appropriate amount of time between treatments to determine whether each instance of treatment was effective before providing additional care.

886. In doing so, the Referring Provider Defendants fraudulently magnified the symptoms and severity of the patients' conditions for the purpose of providing additional treatment and generating additional referrals to maximize billing.

887. As licensed medical providers, the Referring Provider Defendants were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

888. As the individuals responsible for the referrals, Dr. Jones, Dr. Apazidis, and Dr. Kotkes are directly responsible for the misrepresentations made to Allstate by Excell.

889. As the individual in charge of and responsible for Excell, Belotserkovsky is directly responsible for the misrepresentations made to Allstate by Excell.

890. Belotserkovsky managed and operated every aspect of Excell from establishing the pattern and protocol whereby all samples were referred to Suretox for testing regardless of Excell's

testing capabilities, to encouraging fraudulent billing practices designed falsely to increase the amount billed to Allstate, to inappropriately working with providers to obtain as many referrals as possible to generate additional billing.

891.    As the manager and operator of Excell, Belotserkovsky ordered and facilitated the misrepresentation made to Allstate.

892.    Each misrepresentation made by the Referring Providers was also in violation of their legal and ethical obligations as healthcare professionals.

### B.    ALLSTATE'S JUSTIFIABLE RELIANCE

893.    At all relevant times, the Defendants concealed from Allstate the truth regarding the fact and medical necessity of UDT allegedly performed to prevent Allstate from discovering that the claims submitted by Excell were not compensable under New York's No-Fault Laws.

894.    These misrepresentations include submitting false medical documentation, including bills, documenting the fact and necessity of UDT in order to seek No-Fault benefits reimbursement.

895.    Evidence of the fraudulent scheme detailed herein was not discovered until after patterns had emerged and Allstate began to investigate Excell, the Referring Provider Defendants, and the PC Defendants, revealing the true nature and full scope of the Defendants' fraudulent scheme.

896.    The Defendants utilized their superior knowledge of the complex and specialized testing methodologies and billing practices associated with UDT to mask the depth and breadth of their fraudulent billing scheme.

897.    Due to the Defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have

117

discovered that its damages were attributable to fraud until shortly before filing this Complaint.

898.     In reasonable reliance on the Defendants' misrepresentations, Allstate paid money to Excell, Apazidis PC, Phoenix, and Kotkes PC, to its detriment.

899.     Allstate would not have paid these monies had the Defendants provided true and accurate information about the fact and necessity of the drug testing provided.

900.     As a result, Allstate has paid in excess of $1,314,230.43 in reasonable reliance on the false medical documentation and false representations regarding Excell's, Apazidis PC's, Phoenix's, and Kotkes PC's eligibility for reimbursement under New York's No-Fault Laws.

## XI.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

901.     Throughout the course of this scheme, the Defendants created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the law of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

902.     Unless otherwise pleaded to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

903.     Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, NF-3 forms,

CMS-1500 forms, insurance policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

      a.    **EXCELL ENTERPRISE**

904.    Belotserkovsky, Apazidis, Jones, and Kotkes (and/or other persons working at Belotserkovsky's, Apazidis', Jones', and Kotkes' direction and/or on Belotserkovsky's, Apazidis', Jones', and Kotkes' behalf) personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Excell to be mailed to Allstate and/or the claimants or their counsel, and/or acted with knowledge the use of the U.S. Mail would follow in the ordinary course of business.

905.    Belotserkovsky, Apazidis, Jones, and Kotkes (and/or other persons working at Belotserkovsky's, Apazidis', Jones', and Kotkes' direction and/or on Belotserkovsky's, Apazidis', Jones', and Kotkes' behalf) caused Excell to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Excell mailed a demand for payment (i.e., invoice) to Allstate.

906.    During the entire course of this scheme, the provision of the excessive and medically unnecessary services to patients of Excell rendered Excell completely ineligible for No-Fault reimbursement under New York law.

907.    Because Excell was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Belotserkovsky, Apazidis, Jones, and Kotkes (and/or other persons working at Belotserkovsky's, Apazidis', Jones', and Kotkes' direction and/or on Belotserkovsky's, Apazidis', Jones', and Kotkes' behalf) purposely caused Excell to make a

misrepresentation each and every time that Excell mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

908.    Therefore, because (a) Excell was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Belotserkovsky, Apazidis, Jones, and Kotkes (and/or other persons working at Belotserkovsky's, Apazidis', Jones', and Kotkes' direction and/or on Belotserkovsky's, Apazidis', Jones', and Kotkes' behalf) caused Excell to seek No-Fault reimbursement from Allstate, even though Excell was not entitled to such reimbursement, and (c) Excell used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement, it is clear that Belotserkovsky, Apazidis, Jones, and Kotkes committed mail fraud.

909.    At all relevant times, Belotserkovsky, Apazidis, Jones, and Kotkes knew that Excell (including its employees, contractors, and agents), a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare providers, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Excell.

910.    Allstate estimates that the unlawful operation of the Excell enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in the furtherance of this scheme is annexed at **Exhibit 92** and incorporated by references as if set forth in its entirety.

**b.    APAZIDIS PC ENTERPRISE**

911.    Apazidis, Excell and Belotserkovsky (and/or other persons working at Apazidis', Excell's and Belotserkovsky's direction and/or on Apazidis', Excell's, and Belotserkovsky's, behalf) personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Apazidis PC to be mailed to Allstate

and/or the claimants or their counsel, and/or acted with knowledge the use of the U.S. Mail would follow in the ordinary course of business.

912.     Apazidis, Excell and Belotserkovsky (and/or other persons working at Apazidis', Excell's and Belotserkovsky's direction and/or on Apazidis', Excell's and Belotserkovsky's, behalf) caused Apazidis PC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Apazidis PC mailed a demand for payment (i.e., invoice) to Allstate.

913.     During the entire course of this scheme, the provision of the excessive and medically unnecessary services to patients of Apazidis PC rendered Apazidis PC completely ineligible for No-Fault reimbursement under New York law.

914.     Because Apazidis PC was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Apazidis, Excell and Belotserkovsky (and/or other persons working at Apazidis', Excell's and Belotserkovsky's direction and/or on Apazidis', Excell's, and Belotserkovsky's behalf) purposely caused Apazidis PC to make a misrepresentation each and every time that Apazidis PC mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

915.     Therefore, because (a) Apazidis PC was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Apazidis, Excell and Belotserkovsky (and/or other persons working at Apazidis', Excell's and Belotserkovsky's direction and/or on Apazidis', Excell's, and Belotserkovsky's behalf) caused Apazidis PC to seek No-Fault reimbursement from Allstate, even though Apazidis PC was not entitled to such reimbursement, and (c) Apazidis PC used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement, it is clear that Apazidis, Excell and Belotserkovsky committed mail fraud.

916.    At all times relevant, Apazidis, Excell and Belotserkovsky knew that Apazidis PC (including its employees, contractors, and agents), a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare providers, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Apazidis PC.

917.    Allstate estimates that the unlawful operation of the Apazidis PC enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in the furtherance of this scheme is annexed at **Exhibit 93** and incorporated by references as if set forth in its entirety.

### c.    PHOENIX ENTERPRISE

918.    Jones, Excell and Belotserkovsky (and/or other persons working at Jones', Excell's and Belotserkovsky's direction and/or on Jones', Excell's, and Belotserkovsky's, behalf) personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Phoenix to be mailed to Allstate and/or the claimants or their counsel, and/or acted with knowledge the use of the U.S. Mail would follow in the ordinary course of business.

919.    Jones, Excell and Belotserkovsky (and/or other persons working at Jones', Excell's and Belotserkovsky's direction and/or on Jones', Excell's, and Belotserkovsky's, behalf) caused Phoenix to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Phoenix mailed a demand for payment (i.e., invoice) to Allstate.

920.    During the entire course of this scheme, the provision of the excessive and medically unnecessary services to patients of Phoenix rendered Phoenix completely ineligible for

No-Fault reimbursement under New York law.

921.    Because Phoenix was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Jones, Excell and Belotserkovsky (and/or other persons working at Jones', Excell's and Belotserkovsky's direction and/or on Jones', Excell's, and Belotserkovsky's behalf) purposely caused Phoenix to make a misrepresentation each and every time that Phoenix mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

922.    Therefore, because (a) Phoenix was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Jones, Excell and Belotserkovsky (and/or other persons working at Jones', Excell's and Belotserkovsky's direction and/or on Jones', Excell's, and Belotserkovsky's behalf) caused Phoenix to seek No-Fault reimbursement from Allstate, even though Phoenix was not entitled to such reimbursement, and (c) Phoenix used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement, it is clear that Jones, Excell and Belotserkovsky committed mail fraud.

923.    At all times relevant, Jonex, Excell and Belotserkovsky knew that Phoenix (including its employees, contractors, and agents), a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare providers, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Phoenix.

924.    Allstate estimates that the unlawful operation of the Phoenix enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in the furtherance of this scheme is annexed at **Exhibit 94** and incorporated by references as if set forth in its entirety.

### d.   KOTKES PC ENTERPRISE

925.   Kotkes, Excell and Belotserkovsky (and/or other persons working at Kotkes', Excell's and Belotserkovsky's direction and/or on Kotkes', Excell's, and Belotserkovsky's, behalf) personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Kotkes PC to be mailed to Allstate and/or the claimants or their counsel, and/or acted with knowledge the use of the U.S. Mail would follow in the ordinary course of business.

926.   Kotkes, Excell and Belotserkovsky (and/or other persons working at Kotkes', Excell's and Belotserkovsky's direction and/or on Kotkes', Excell's and Belotserkovsky's, behalf) caused Kotkes PC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Kotkes PC mailed a demand for payment (i.e., invoice) to Allstate.

927.   During the entire course of this scheme, the provision of the excessive and medically unnecessary services to patients of Kotkes PC rendered Kotkes PC completely ineligible for No-Fault reimbursement under New York law.

928.   Because Kotkes PC was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Kotkes, Excell and Belotserkovsky (and/or other persons working at Kotkes', Excell's and Belotserkovsky's direction and/or on Kotkes', Excell's, and Belotserkovsky's behalf) purposely caused Kotkes PC to make a misrepresentation each and every time that Kotkes PC mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

929.   Therefore, because (a) Kotkes PC was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Kotkes, Excell and Belotserkovsky (and/or other persons working at

Kotkes', Excell's and Belotserkovsky's direction and/or on Kotkes', Excell's, and Belotserkovsky's behalf) caused Kotkes PC to seek No-Fault reimbursement from Allstate, even though Kotkes PC was not entitled to such reimbursement, and (c) Kotkes PC used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement, it is clear that Kotkes, Excell and Belotserkovsky committed mail fraud.

930.   At all times relevant, Kotkes, Excell and Belotserkovsky knew that Kotkes PC (including its employees, contractors, and agents), a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare providers, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Kotkes PC.

931.   Allstate estimates that the unlawful operation of the Kotkes PC enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in the furtherance of this scheme is annexed at **Exhibit 95** and incorporated by references as if set forth in its entirety.

## XII.   <u>DAMAGES</u>

932.   The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made in connection with first-party claims in excess of $1,314,230.43, the exact amount to be determined at trial, including:

(a) Payments made to Excell in connection with first-party claims in excess of $228,339.93, the exact amount to be determined at trial. The chart annexed as **Exhibit**

**96**, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Excell in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b) Payments made to Apazidis PC in connection with first-party claims in excess of $335,646.62, the exact amount to be determined at trial.  The chart annexed as **Exhibit 97**, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Apazidis PC in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(c) Payments made to Phoenix in connection with first-party claims in excess of $490,928.63 the exact amount to be determined at trial. The chart annexed as **Exhibit 98**, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Phoenix in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(d) Payments made to Kotkes PC in connection with first-party claims in excess of $259,315.25, the exact amount to be determined at trial. The chart annexed as **Exhibit 99**, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Kotkes PC in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## XIII.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### EXCELL CLINICAL LABORATORY, INC. ENTERPRISE
**(Against Marina Belotserkovsky, Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes M.D., P.C.)**

933.    Allstate re-alleges and incorporates by reference paragraphs 1 to 932 set forth above as if fully set forth herein.

934.    Excell Clinical Lab, Inc. ("Excell") constitutes an enterprise, as defined in 18 U.S.C. § 1961(c), engaged in, and the activities of which affect, interstate commerce.

935.    In connection with each of the claims identified in the within Complaint and the exhibits hereto, Marina Belotserkovsky, Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes, M.D., P.C. (collectively, the "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation by Excell, or knew that such false medical documentation would be mailed in the ordinary course of Excell's business, or should have reasonably foreseen that the mailing of such false medical documentation by Excell would occur, in furtherance of the Count I Defendants' scheme to defraud.

936.    The Count I Defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including but not limited to those dates identified in the chart annexed hereto at **Exhibit 92**.

937.    Among other things, lab reports, letters of medical necessity, medical records, bills, and invoices were delivered to Allstate thought the U.S. Mail.

938.    Policies of insurance were delivered to insureds through the U.S. Mail.

127

939.   Payments to Excell from Allstate were transmitted through the U.S. Mail.

940.   As documented above, the Count I Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for UDT that was purportedly performed by Excell to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the New York No-Fault Act.

941.   As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Excell for the benefit of the Count I Defendants that would not otherwise have been paid.

942.   The Count I Defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Defendants to continue their fraudulent scheme without detection.

943.   The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

944.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

945.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Excell for the benefit of the Count I Defendants.

946.   The Count I Defendants participated in the conduct of the Excell enterprise through a pattern of racketeering activities.

947.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business

128

or property by reason of the Count I Defendants' fraudulent acts.

948.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

949.    Allstate is in the business of writing insurance and paying claims.

950.    Insurance fraud schemes like the one detailed herein have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

951.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**EXCELL CLINICAL LABORATORY, INC. ENTERPRISE**
**(Against Marina Belotserkovsky, Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C.,**
**William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain**
**Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes M.D., P.C.)**

952.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

953.    Defendants Marina Belotserkovsky, Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes, M.D., P.C. (collectively, the "Count II Defendants") conspired with each other to violate 18 U.S.C. §1962(c) through the facilitation of the operation of Excell Clinical Lab, Inc. ("Excell").

954.    The Count II Defendants each agreed to further, facilitate, support, and/or operate the Excell enterprise.

955.    As such, the Count II Defendants conspired to violate 18 U.S.C.§1962(d).

956.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Excell even though Excell was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

957.   The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claims and medical documents containing material misrepresentations.

958.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II Defendants' unlawful conduct described herein.

959.   By virtue of this violation of 18 U.S.C. §1962(d), the Count II Defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**ALEXIOS APAZIDIS, M.D. P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and Alexios Apazidis, M.D.)**

960.   Allstate re-alleges and incorporates by reference paragraphs 1 to 932 set forth above as if fully set forth herein.

961.   Alexios Apazidis, M.D. P.C. ("Apazidis PC") constitutes an enterprise, as defined in 18 U.S.C. § 1961(c), engaged in, and the activities of which affect, interstate commerce.

962.   In connection with each of the claims identified in the within Complaint and the exhibits hereto, Marina Belotserkovsky, Excell Clinical Lab, Inc. and Alexios Apazidis, M.D. (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed false

medical documentation by Apazidis PC, or knew that such false medical documentation would be mailed in the ordinary course of Apazidis PC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Apazidis PC would occur, in furtherance of the Count III Defendants' scheme to defraud.

963.    The Count III Defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including but not limited to those dates identified in the chart annexed hereto at **Exhibit 93**.

964.    Among other things, lab reports, letters of medical necessity, medical records, bills, and invoices were delivered to Allstate thought the U.S. Mail.

965.    Policies of insurance were delivered to insureds through the U.S. Mail.

966.    Payments to Apazidis PC from Allstate were transmitted through the U.S. Mail.

967.    As documented above, the Count III Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for treatment and testing that was purportedly performed by Apazidis PC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the New York No-Fault Act.

968.    As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Apazidis PC for the benefit of the Count III Defendants that would not otherwise have been paid.

969.    The Count III Defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Defendants to continue their fraudulent scheme without detection.

970.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

971.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

972.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Apazidis PC for the benefit of the Count III Defendants.

973.    The Count III Defendants participated in the conduct of the Apazidis PC enterprise through a pattern of racketeering activities.

974.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' fraudulent acts.

975.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

976.    Allstate is in the business of writing insurance and paying claims.

977.    Insurance fraud schemes like the one detailed herein have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

978.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**ALEXIOS APAZIDIS MD PC ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc. and Alexios Apazidis, M.D.)**

979.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

980.   Defendants Marina Belotserkovsky, Excell Clinic Lab, Inc., and Alexios Apazidis, M.D. (collectively, the "Count IV Defendants") conspired with each other to violate 18 U.S.C. §1962(c) through the facilitation of the operation of Apazidis PC.

981.   The Count IV Defendants each agreed to further, facilitate, support, and/or operate the Apazidis PC enterprise.

982.   As such, the Count IV Defendants conspired to violate 18 U.S.C. §1962(c).

983.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Apazidis PC even though Apazidis was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

984.   The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claims and medical documents containing material misrepresentations.

985.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

986.   By virtue of this violation of 18 U.S.C. §1962(d), the Count IV Defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV Defendants, and others acting in concert with them, together with the costs of suit, including

reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION ENTERPRISE
### (Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and William Jones, M.D.)

987.    Allstate re-alleges and incorporates by reference paragraphs 1 to 932 set forth above as if fully set forth herein.

988.    Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix") constitutes an enterprise, as defined in 18 U.S.C. § 1961(c), engaged in, and the activities of which affect, interstate commerce.

989.    In connection with each of the claims identified in the within Complaint and the exhibits hereto, Marina Belotserkovsky, Excell Clinical Lab, Inc., and William Jones, M.D. (collectively, the "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation by Phoenix, or knew that such false medical documentation would be mailed in the ordinary course of Phoenix's business, or should have reasonably foreseen that the mailing of such false medical documentation by Phoenix would occur, in furtherance of the Count V Defendants' scheme to defraud.

990.    The Count V Defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including but not limited to those dates identified in the chart annexed hereto at **Exhibit 94**.

991.    Among other things, lab reports, letters of medical necessity, medical records, bills, and invoices were delivered to Allstate thought the U.S. Mail.

992.    Policies of insurance were delivered to insureds through the U.S. Mail.

993.    Payments to Phoenix from Allstate were transmitted through the U.S. Mail.

994.  As documented above, the Count V Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for UDT that was purportedly performed by Phoenix to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the New York No-Fault Act.

995.  As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Phoenix for the benefit of the Count V Defendants that would not otherwise have been paid.

996.  The Count V Defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Defendants to continue their fraudulent scheme without detection.

997.  The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

998.  By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

999.  The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Excell for the benefit of the Count V Defendants.

1000.  The Count V Defendants participated in the conduct of the Phoenix enterprise through a pattern of racketeering activities.

1001.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' fraudulent acts.

1002. The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1003. Allstate is in the business of writing insurance and paying claims.

1004. Insurance fraud schemes like the one detailed herein have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1005. By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN
### MANAGEMENT & REHABILITATION ENTERPRISE
### (Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and William Jones, M.D.)

1006. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

1007. Defendants Marina Belotserkovsky, Excell Clinical Lab, Inc. and William Jones (collectively, the "Count VI Defendants") conspired with each other to violate 18 U.S.C. §1962(d) through the facilitation of the operation of Phoenix.

1008. The Count VI Defendants each agreed to further, facilitate, support, and/or operate the Phoenix enterprise.

1009. As such, the Count VI Defendants conspired to violate 18 U.S.C.§1962(d).

1010. The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Phoenix even though Phoenix was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

136

1011.   The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claims and medical documents containing material misrepresentations.

1012.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI Defendants' unlawful conduct described herein.

1013.   By virtue of this violation of 18 U.S.C. §1962(d), the Count VI Defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**HERSCHEL KOTKES M.D., P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc. and Herschel Kotkes, M.D.)**

1014.   Allstate re-alleges and incorporates by reference paragraphs 1 to 932 set forth above as if fully set forth herein.

1015.   Herschel Kotkes, M.D., P.C. ("Kotkes PC") constitutes an enterprise, as defined in 18 U.S.C. § 1961(c), engaged in, and the activities of which affect, interstate commerce.

1016.   In connection with each of the claims identified in the within Complaint and the exhibits hereto, Marina Belotserkovsky, Excell Clinical Lab, Inc., and Herschel Kotkes, M.D. (collectively, the "Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation by Kotkes PC or knew that such false medical documentation would be mailed in the ordinary course of Kotkes PC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Kotkes PC would occur, in furtherance of

the Count VII Defendants' scheme to defraud.

1017.  The Count VII Defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including but not limited to those dates identified in the chart annexed hereto at **Exhibit 95**.

1018.  Among other things, lab reports, letters of medical necessity, medical records, bills, and invoices were delivered to Allstate thought the U.S. Mail.

1019.  Policies of insurance were delivered to insureds through the  U.S. Mail.

1020.  Payments to Kotkes PC from Allstate were transmitted through the U.S. Mail.

1021.  As documented above, the Count VII Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for treatment and testing that was purportedly performed by Kotkes PC to collect payment  from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the New York No-Fault Act.

1022.  As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Kotkes PC for the benefit of the Count VII Defendants that would not otherwise have been paid.

1023.  The Count VII Defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Defendants to continue their fraudulent scheme without detection.

1024.  The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

1025.  By mailing, or agreeing that the mails would be used to submit, numerous

fraudulent claims in an ongoing scheme, the Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1026. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Kotkes PC for the benefit of the Count VII Defendants.

1027. The Count VII Defendants participated in the conduct of the Kotkes PC enterprise through a pattern of racketeering activities.

1028. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' fraudulent acts.

1029. The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1030. Allstate is in the business of writing insurance and paying claims.

1031. Insurance fraud schemes like the one detailed herein have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1032. By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**HERSCHEL KOTKES M.D., P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc. and Herschel Kotkes, M.D.)**

1033. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

1034. Defendants Marina Belotserkovsky, Excell Clinical Lab, Inc. and Herschel Kotkes, M.D. (collectively, the "Count VIII Defendants") conspired with each other to violate 18

U.S.C. §1962(c) through the facilitation of the operation of Kotkes PC

1035.   The Count VIII Defendants each agreed to further, facilitate, support, and/or operate the Kotkes PC enterprise.

1036.   As such, the Count VIII Defendants conspired to violate 18 U.S.C.§1962(d).

1037.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Kotkes PC even though Kotkes PC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1038.   The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claims and medical documents containing material misrepresentations.

1039.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII Defendants' unlawful conduct described herein.

1040.   By virtue of this violation of 18 U.S.C. §1962(d), the Count VIII Defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## COMMON LAW FRAUD
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes M.D., P.C.)**

1041.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

140

1042.   Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes, M.D., P.C. (collectively, "Count IX Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for UDT and unnecessary medical services under New York's No-Fault laws.

1043.   The false and fraudulent statements of material fact and acts of fraudulent concealment include representations made in every claim that Excell Clinical Lab, Inc. ("Excell") was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the UDT because Excell was not eligible to seek or collect No-Fault benefit payments for these services because Excell was not authorized to conduct business in the State of New York and the services were not reasonable or necessary.

1044.   The Count IX Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Excell that were not compensable under New York's No-Fault laws.

1045.   Allstate reasonably relied, to its detriment, upon the Count IX Defendants' material misrepresentations concerning Excell's eligibility to receive No-Fault reimbursement when making payments for UDT purportedly provided to Allstate claimants through Excell.

1046.   Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over

$228,339.93 in connection with fraudulent bills submitted by the Count IX Defendants through Excell.

**COUNT X**
**COMMON LAW FRAUD**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., and Alexios Apazidis, M.D. P.C.)**

1047.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

1048.   Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., and Alexios Apazidis, M.D. P.C. (collectively, "Count X Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

1049.   The false and fraudulent statements of material fact and acts of fraudulent concealment include representations made in every claim that Alexios Apazidis, M.D. P.C. ("Apazidis PC") was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for medical services and testing because Apazidis was not eligible to seek or collect No-Fault benefit payments for these services because the services were a) not not medically necessary; and 2) provided pursuant to a predetermined protocol designed to financially enrich the defendants (rather than to treat or otherwise benefit the patients who were purportedly subjected to them).

1050.   The Count X Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Apazidis PC that were not compensable under New York's No-Fault laws.

1051.   Allstate reasonably relied, to its detriment, upon the Count X Defendants' material misrepresentations concerning Apazidis PC's eligibility to receive No-Fault reimbursement when making payments for medical services and testing purportedly provided to Allstate claimants through Apazidis PC.

1052.   Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $335,646.62 in connection with fraudulent bills submitted by the Count X Defendants through Apazidis PC.

## COUNT XI
## COMMON LAW FRAUD
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., William Jones, M.D., and Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation)**

1053.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

1054.   Marina Belotserkovsky, Excell Clinical Lab, Inc., William Jones, M.D., and Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation (collectively, "Count XI Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

1055.   The false and fraudulent statements of material fact and acts of fraudulent concealment include representations made in every claim that Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix") was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for medical services and testing because Phoenix was not eligible

143

to seek or collect No-Fault benefit payments for these services because the services were a) not medically necessary; and (b) provided pursuant to a predetermined protocol designed to financially enrich the defendants (rather than to treat or otherwise benefit the patients who were purportedly subjected to them).

1056. The Count XI Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Phoenix that were not compensable under New York's No-Fault laws.

1057. Allstate reasonably relied, to its detriment, upon the Count XI Defendants' material misrepresentations concerning Phoenix's eligibility to receive No-Fault reimbursement when making payments for medical services and testing purportedly provided to Allstate claimants through Phoenix.

1058. Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $490,928.63 in connection with fraudulent bills submitted by the Count XI Defendants through Phoenix.

<u>**COUNT XII**</u>
**COMMON LAW FRAUD**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Herschel Kotkes, M.D. and Herschel Kotkes, M.D., P.C.)**

1059. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

1060. Marina Belotserkovsky, Excell Clinical Lab, Inc., Herschel Kotkes, M.D. and Herschel Kotkes, M.D., P.C. (collectively, "Count XII Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material

facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

1061.   The false and fraudulent statements of material fact and acts of fraudulent concealment include representations made in every claim that Herschel Kotkes, M.D., P.C. ("Kotkes PC") was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for medical services and testing because Kotkes PC was not eligible to seek or collect No-Fault benefit payments for these services because the services were a) not medically necessary; and (b) provided pursuant to a predetermined protocol designed to financially enrich the defendants (rather than to treat or otherwise benefit the patients who were purportedly subjected to them).

1062.   The Count XII Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Kotkes PC that were not compensable under New York's No-Fault laws.

1063.   Allstate reasonably relied, to its detriment, upon the Count XII Defendants' material misrepresentations concerning Kotkes PC's eligibility to receive No-Fault reimbursement when making payments for medical services and testing purportedly provided to Allstate claimants through Kotkes PC.

1064.   Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $259,315.25 in connection with fraudulent bills submitted by the Count XII Defendants through Kotkes PC.

**COUNT XIII**

**UNJUST ENRICHMENT**

**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes M.D., P.C.)**

1065.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

1066.   As detailed above, Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes, M.D., P.C. (collectively, "Count XIII Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1067.   The Count XIII Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Excell Clinical Lab, Inc.

1068.   The payments received by the Count XIII Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1069.   The Count XIII Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1070.   By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XIII Defendants have been unjustly enriched in an amount totaling $228,339.93, the exact amount to be determined at trial.

146

## COUNT XIV
## UNJUST ENRICHMENT
### (Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., and Alexios Apazidis, M.D. P.C.)

1071.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

1072.   As detailed above, Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., and Alexios Apazidis, M.D. P.C., (collectively, "Count XIV Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1073.   The Count XIV Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Alexios Apazidis, M.D. P.C.

1074.   The payments received by the Count XIV Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1075.   The Count XIV Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1076.   By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XIV Defendants have been unjustly enriched in an amount totaling $335,646.62, the exact amount to be determined at trial.

## COUNT XV
## UNJUST ENRICHMENT
### (Against Marina Belotserkovsky, Excell Clinical Lab, Inc., William Jones, M.D., and Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation)

1077.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

147

1078.   As detailed above, Marina Belotserkovsky, Excell Clinical Lab, Inc., William Jones, and Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation (collectively, "Count XV Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1079.   The Count XV Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix").

1080.   The payments received by the Count XV Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1081.   The Count XV Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1082.   By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XV Defendants have been unjustly enriched in an amount totaling $490,928.63, the exact amount to be determined at trial.

## COUNT XVI
## UNJUST ENRICHMENT
### (Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Herschel Kotkes, M.D. and Herschel Kotkes, M.D., P.C.)

1083.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 932 as if set forth fully herein.

1084.   As detailed above, Marina Belotserkovsky, Excell Clinical Lab, Inc., Herschel Kotkes, M.D. and Herschel Kotkes, M.D., P.C. (collectively, "Count XVI Defendants") have

engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1085.   The Count XVI Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Herschel Kotkes, M.D., P.C. ("Kotkes PC").

1086.   The payments received by the Count XVI Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1087.   The Count XVI Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1088.   By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XVI Defendants have been unjustly enriched in an amount totaling $259,315.25, the exact amount to be determined at trial.

## COUNT XVII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### (Against Excell Clinical Laboratory, Inc.)

1089.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

1090.   Excell Clinical Laboratory, Inc. billed for medically unnecessary UDT with respect to the patients at issue in this Complaint.

1091.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, et seq.), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

1092.   Under the New York No-Fault Laws, individuals are entitled to be compensated

149

for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

1093.   "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. See N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

1094.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1095.   Allstate is not obligated to pay insurance proceeds for any services that were not rendered and/or that were unnecessary.

1096.   Where a claimant and/or assignee (such as Excell) is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1097.   Excell continues to submit claims under the New York No- Fault Act for unnecessary and/or not rendered services and other claims remain pending with Allstate.

1098.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Excell Clinical Laboratory, Inc., at all relevant times, was (a) improperly licensed as a UDT facility, (b) improperly billed for services it did not provide, (c) was not licensed to do business in New York, (d) billing for services rendered pursuant to an unlawful referral, and (e) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

1099.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Excell Clinical Laboratory, Inc. provided medically

unnecessary drug testing that is not compensable under the New York No-Fault Act.

1100.   As such, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Excell Clinical Laboratory, Inc. has no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

## COUNT XVIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### (Against Phoenix Medical Services, P.C.)

1101.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

1102.   Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix") billed for medically unnecessary testing and treatment with respect to the patients at issue in this Complaint.

1103.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, et seq.), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

1104.   Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

1105.   "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. See N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

1106.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1107.   Allstate is not obligated to pay insurance proceeds for any services that were not rendered and/or that were unnecessary.

1108.   Where a claimant and/or assignee (such as Phoenix) is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1109.   Phoenix continues to submit claims under the New York No- Fault Act for unnecessary and/or not rendered services and other claims remain pending with Allstate.

1110.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Phoenix at all relevant times, was (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

1111.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Phoenix  provided medically unnecessary treatment and testing that is not compensable under the New York No-Fault Act.

1112.   As such, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Phoenix has no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

## COUNT XIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### (Against Alexios Apazidis, M.D. P.C.)

1113.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

1114.   Alexios Apazidis, M.D. P.C. ("Apazidis") billed for medically unnecessary testing

and treatment with respect to the patients at issue in this Complaint.

1115.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, et seq.), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

1116.   Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

1117.   "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. See N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

1118.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1119.   Allstate is not obligated to pay insurance proceeds for any services that were not rendered and/or that were unnecessary.

1120.   Where a claimant and/or assignee (such as Apazidis PC) is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1121.   Apazidis PC continues to submit claims under the New York No- Fault Act for unnecessary and/or not rendered services and other claims remain pending with Allstate.

1122.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Apazidis PC, at all relevant times, was (a) billing

for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

1123.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Apazidis PC provided medically unnecessary treatment and testing that is not compensable under the New York No-Fault Act.

1124.   As such, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Apazidis PC has no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

**COUNT XX**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**(Against Herschel Kotkes, M.D., P.C.)**

1125.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 932 set forth above as if fully set forth herein.

1126.   Herschel Kotkes, M.D., P.C. ("Kotkes PC") billed for medically unnecessary UDT and medical treatment with respect to the patients at issue in this Complaint.

1127.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, et seq.), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

1128.   Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

1129.   "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. See N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

1130.   Where a provider is unable to show that an expense has been incurred for a

reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1131.   Allstate is not obligated to pay insurance proceeds for any services that were not rendered and/or that were unnecessary.

1132.   Where a claimant and/or assignee (such as Kotkes PC) is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding  of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1133.   Kotkes PC continues to submit claims under the New York No- Fault Act for unnecessary and/or not rendered services and other claims remain pending with Allstate.

1134.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Kotkes PC, at all relevant times, was (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

1135.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Kotkes PC provided medically unnecessary treatment and testing that is not compensable under the New York No-Fault Act.

1136.   As such, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Kotkes PC has no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

## XIV.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company and Allstate Property and Casualty Insurance Company respectfully request that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**EXCELL CLINICAL LABORATORY, INC. ENTERPRISE**
**(Against Marina Belotserkovsky, Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C.,**
**William Jones, M.D., Phoenix Medical Services, M.D., P.C. d/b/a Rockville Centre Pain**
**Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes, M.D.,**
**P.C.)**

(a)     AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just and proper.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**EXCELL CLINICAL LABORATORY, INC. ENTERPRISE**
**(Against Marina Belotserkovsky, Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C.,**
**William Jones, M.D., Phoenix Medical Services, M.D., P.C. d/b/a Rockville Centre Pain**
**Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes, M.D.,**
**P.C.)**

(a)     AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the Defendants from engaging in

the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just and proper.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**ALEXIOS APAZIDIS, M.D. P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and Alexios Apazidis, M.D.)**

(a)      AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just and proper.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**ALEXIOS APAZIDIS, M.D. P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and Alexios Apazidis, M.D.)**

(a)      AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just and proper.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN**
**MANAGEMENT & REHABILITATION ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and William Jones, M.D.)**

(a)    AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just and proper.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN**
**MANAGEMENT & REHABILITATION ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., and William Jones, M.D.)**

(a)    AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just and proper.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**HERSCHEL KOTKES M.D., P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc. and Herschel Kotkes, M.D.)**

(a)      AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just and proper.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**HERSCHEL KOTKES M.D., P.C. ENTERPRISE**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc. and Herschel Kotkes, M.D.)**

(a)      AWARD Allstate its actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just and proper.

159

**COUNT IX**
**COMMON LAW FRAUD**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes M.D., P.C.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just and proper.

**COUNT X**
**COMMON LAW FRAUD**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., and Alexios Apazidis, M.D. P.C.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just and proper.

**COUNT XI**
**COMMON LAW FRAUD**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs

incurred in the detection of the Defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just and proper.

## COUNT XII
## COMMON LAW FRAUD
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Herschel Kotkes, M.D. and Herschel Kotkes, M.D., P.C.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just and proper.

## COUNT XIII
## UNJUST ENRICHMENT
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., Alexios Apazidis, M.D. P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Herschel Kotkes, M.D., and Herschel Kotkes M.D., P.C.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT any other relief this Court deems just and proper.

## COUNT XIV
## UNJUST ENRICHMENT
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Alexios Apazidis, M.D., and Alexios Apazidis, M.D. P.C.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT any other relief this Court deems just and proper.

161

**COUNT XV**
**UNJUST ENRICHMENT**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., William**
**Jones, M.D., and Phoenix Medical Services, P.C. d/b/a Rockville**
**Centre Pain Management & Rehabilitation)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be

determined at trial; and

(b)     GRANT any other relief this Court deems just and proper.

**COUNT XVI**
**UNJUST ENRICHMENT**
**(Against Marina Belotserkovsky, Excell Clinical Lab, Inc., Herschel**
**Kotkes, M.D. and Herschel Kotkes, M.D., P.C.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be

determined at trial; and

(b)     GRANT any other relief this Court deems just and proper.

**COUNT XVII**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**(Against Excell Clinical Laboratory, Inc.)**

(a)     DECLARE that Excell Clinical Laboratory, In. wrongfully submitted bills for

UDT that was not actually provided and, therefore, not compensable under the New York No-

Fault Act;

(b)     DECLARE that Excell Clinical Laboratory, Inc. wrongfully submitted bills for

UDT that was not necessary and, therefore, not compensable under the New York No-Fault Act;

(c)     DECLARE that the activities of Excell Clinical Laboratory, Inc. were fraudulent;

(d)     DECLARE that Allstate has no obligation to pay pending and/or previously-

denied No-Fault insurance claims submitted by Excell Clinical Laboratory, Inc.; and

(e)      GRANT all other relief this Court deems just and proper.

## COUNT XVIII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**(Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation)**

(a)      DECLARE that Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation wrongfully submitted bills for urine drug testing that was not actually provided and, therefore, not compensable under the New York No-Fault Act;

(b)      DECLARE that Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation wrongfully submitted bills for UDT that was not necessary and, therefore, not compensable under the New York No-Fault Act;

(c)      DECLARE that the activities of Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation were fraudulent;

(d)      DECLARE that Allstate has no obligation to pay pending and/or previously-denied No-Fault insurance claims submitted by Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation; and

(e)      GRANT all other relief this Court deems just and proper.

## COUNT XIX
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**(Against Alexios Apazidis, M.D. P.C.)**

(a)      DECLARE that Alexios Apazidis, M.D. P.C. wrongfully submitted bills for UDT that was not actually provided and, therefore, not compensable under the New York No-Fault Act;

(b)      DECLARE that Alexios Apazidis, M.D. P.C. wrongfully submitted bills for UDT that was not necessary and, therefore, not compensable under the New York No-Fault Act;

(c)     DECLARE that the activities of Alexios Apazidis, M.D. P.C. were fraudulent;

(d)     DECLARE that Allstate has no obligation to pay pending and/or previously-denied No-Fault insurance claims submitted by Alexios Apazidis, M.D. P.C.; and

(e)     GRANT all other relief this Court deems just and proper.

## COUNT XX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### (Against Herschel Kotkes, M.D., P.C.)

(a)     DECLARE that Herschel Kotkes, M.D., P.C. wrongfully submitted bills for UDT that was not actually provided and, therefore, not compensable under the New York No-Fault Act;

(b)     DECLARE that Herschel Kotkes, M.D., P.C. wrongfully submitted bills for UDT that was not necessary and, therefore, not compensable under the New York No-Fault Act;

(c)     DECLARE that the activities of Herschel Kotkes, M.D., P.C. were fraudulent;

(d)     DECLARE that Allstate has no obligation to pay pending and/or previously-denied No-Fault insurance claims submitted by Herschel Kotkes, M.D., P.C.; and

(e)     GRANT all other relief this Court deems just and proper.

## JURY TRIAL DEMAND

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

164

KING, TILDEN, McETTRICK & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@ktmpc.com
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C.M. Brady (HB4724)
hbrady@ktmpc.com

350 Granite St, Ste 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company,*
*Allstate Fire and Casualty Insurance Company, and Allstate*
*Property & Casualty Insurance Company*

Dated: January 20, 2022